52 So.2d 736 (1951)
DE ROODE
v.
JAHNCKE SERVICE, Inc., et al.
No. 19627.
Court of Appeal of Louisiana, Orleans.
May 21, 1951.
*737 Rosen, Kammer, Wolff, Hopkins & Burke, New Orleans, for plaintiff and appellee.
Deutsch, Kerrigan & Stiles, New Orleans, R. Emmett Kerrigan and Gerald J. Gallinghouse, New Orleans, of counsel, for Jahncke Service, Inc., and Employers' Liability Assur. Corp., Ltd., defendants and appellants.
May & Carrere, New Orleans, for Boh Bros. Const. Co. and Travelers Ins. Co., defendants and appellants.
*738 Jones, Flanders, Waechter & Walker, New Orleans, for intervenor-appellee, Liberty Mut. Ins. Co.
JANVIER, Judge.
Roger deRoode, aged 67 at the time of the accident from which this suit results, and which occurred on October 6th, 1948, was a concrete inspector employed by Pittsburgh Testing Laboratory. He sustained serious physical injuries when a large concrete mixing truck belonging to Jahncke Service, Inc., was backed into him.
Jahncke Service, Inc., was supplying the concrete to Boh Bros. Construction Company, a partnership which was doing the paving in East Parkchester Subdivision, in the City of New Orleans. Boh Bros. Construction Company was the subcontractor of Shelby Construction Company, Inc., the corporation which was the general contractor and was doing the building, paving and other construction work in the subdivision. The Employers' Liability Assurance Corporation, Ltd., had issued to Jahncke Service, Inc., a public liability insurance policy with a limit of $25,000.00 in the case of injury to any one person. The Travelers Insurance Company had issued to Boh Bros. Construction Company a public liability insurance policy with a maximum limit in the case of injury to any one person in excess of the amount claimed by plaintiff.
Alleging that the accident was caused by the negligence of the employees of Jahncke Service, Inc., and of Boh Bros. Construction Company, deRoode brought this suit against both and also against both insurers, praying for solidary judgment in the sum of $71,429.21.
Liberty Mutual Insurance Company intervened and alleged that it had issued a policy of Workmen's Compensation Insurance to Pittsburgh Testing Laboratory and that that policy contained a "Full Medical Endorsement," under the terms of which endorsement the said insurance company "undertook to provide, in addition to the statutory medical surgical and hospital services required by the provisions of the Louisiana Workmen's Compensation Law * * * the reasonable and proper costs of such medical, surgical, hospital services, nursing, medicines and mechanical aids as Liberty Mutual Insurance Company believed to be necessary for the treatment of an injury to an employee of Pittsburgh Testing Laboratory * * *."
The intervenor alleged that because of its liability under that policy, it had paid, or would become liable for compensation payments of $30.00 per week for four hundred weeks, and had paid medical, doctors', nurses' hospital and other related expenses amounting to $11,740.46, and would become liable for further similar expenses of not less than $5,000.00. The intervenor alleged that, as a result of such payments and such assumption of liability, it had become subrogated "to the extent of any payment to all rights of recovery therefor vested by law either in the employer or in any employee," and the intervenor prayed that there be judgment in its favor and against the plaintiff and the defendants and that it be paid, out of any judgment rendered, $18,270.46.
Jahncke Service, Inc., and The Employers' Liability Assurance Corporation, Ltd., answered admitting the occurrence of the accident, but denying the negligence of any employee of the Jahncke Company and averring that if there was any negligence other than on the part of plaintiff himself, it was negligence of employees of Boh Bros. Construction Company. The Jahncke Company and its insurer then alleged, in the alternative, that plaintiff himself was guilty of contributory negligence in that he "voluntarily and unnecessarily placed himself into the exact position into which it was expected that said truck would be backed * * *," and in that he "saw or should have seen said truck backing in time to have removed himself from the path of said truck * * *," and in that, in doing so, "he voluntarily assumed the risk of said known and obvious danger."
Boh Bros. Construction Company and The Travelers Insurance Company also answered admitting the occurrence of the accident, but denying that any employee of Boh Bros. Construction Company was in any way at fault, and alleging that, in the alternative, plaintiff himself was guilty of *739 contributory negligence in that he "placed himself in an obviously dangerous position in the rear of the said truck * * *" and "saw or should have seen said truck backing in time to have removed himself from the path of said truck before being run over by it; * * *."
All defendants denied that there could be any recovery by the intervenor.
After a lengthy trial, which has produced a voluminous record, there was judgment in favor of plaintiff and intervenor solidarily against all four defendants. The amount awarded plaintiff was $38,667.23. The amount awarded the intervenor out of the judgment in favor of plaintiff included two items, one of $2580.00, representing compensation payments already made to the plaintiff, and the other, $12,072.23, representing the medical expenses paid and to be paid by the intervenor. It was also decreed that the intervenor, in addition to the amount of compensation payments which it had already paid, should receive "all compensation payments made * * * prior to the date of the payment of this judgment." The judgment, insofar as it runs against The Employers' Liability Assurance Corporation, Ltd., was limited to $25,000.00.
From that judgment all defendants have appealed. Plaintiff has answered the appeal praying that the amount of the judgment be increased to $71,429.21, as originally prayed for.
A clear understanding of a rather complicated situation at the scene of the accident is essential.
Shelby Construction Company was the general contractor in the construction of East Parkchester Subdivision. The general contractor had employed the partnership, Boh Bros. Construction Company, to do certain paving work, and Boh Bros. Construction Company had contracted with Jahncke Service, Inc., for the furnishing by that corporation of the necessary ready mixed concrete, which was to be delivered in the mixing truck of the Jahncke Company.
The plaintiff, Roger deRoode, was an employee of Pittsburgh Testing Laboratory, and that concern had been employed to see to it that the concrete was of the proper consistency as it was delivered.
The work which was in progress was the paving of two parking areas, one on each side of a service drive. The service drive was about the width of an ordinary street, and extended in the general direction of from north to south. On each side of this service drive there was to be a paved area for automobile parking. The concrete for the service drive already had been poured but had not hardened sufficiently to permit the delivery trucks to drive over that concrete without the use of certain very heavy portable runways or mats, which were provided to protect the already poured concrete. These mats were each about 10 feet in length, about 30 inches wide and 3 inches thick, and they were laid end to end in parallel rows, the two parallel rows being about 3½ feet apart so that there were thus provided two separate runways for each truck one runway for the right wheels and one for the left wheels.
The concrete, which was at that time being poured, was in the parking area which was on the east side of the already poured service drive, and as each truck came up to the property to deliver its contents, it entered the service driveway from the south, proceeded along the runway towards the north, and then backed at an angle of about 45 degrees to its right onto the parking area which was being paved.
There were also provided on that parking area similar mats or runways, so that each truck might back upon them and not sink into the concrete which was being poured.
The truck, which caused the accident, was being driven by Freddie Powell, an employee of Jahncke Service, Inc. It followed the usual procedureentered the driveway from the south, proceeded along the double runway towards the north, and then backed at an angle of about 45 degrees on to the parking area. At some time during that processthe evidence does not make it clear just whendeRoode, plaintiff, was handed a delivery ticket by the driver of the truck and he signed this ticket and delivered it back to the driver. The truck then proceeded to discharge its contents, and the plaintiff went to a position on the east edge of the service drive and there engaged in conversation with Fred Gibson, *740 an employee of Boh Bros. Construction Company, who was engaged in smoothing concrete which had already been poured. The conversation, the record indicates, concerned the question of whether or not the concrete was of the proper consistency, and the record shows too that deRoode was in a stooping position, either looking at or examining the concrete, when the accident occurred.
After delivering its contents, the truck in question was driven forward by Powell off the parking area onto the service drive. It was then upon the two lines of mats or runways on the service drive with its front towards the north and its rear towards the south, and, south of it, somewhere between 20 and 40 feet away were Gibson and deRoode, who were on the service drive and very near to the east edge thereof. The truck, under the control of Jahncke's employee, Powell, backed towards the south. Just before it reached Gibson and deRoode, Gibson saw it and jumped to a position of safety, but deRoode did not see it and was struck, run over and seriously injured by its right rear wheels.
When the truck started its backing movement, somewhere between its rear and the position in which Gibson and deRoode were located, there was a vibrator machine, which was under the control of Edward Bennett, also an employee of Boh Bros. This machine apparently was on the parking area and not on the service drive, but its handles were extending over the service drive, so that the truck, in its backing movement, would have struck these handles, or possibly a part of the machine itself. What occurred at that time between Bennett, who was in charge of the vibrator machine, and Powell, the operator of the truck, is of the utmost importance. Bennett says that he noticed that the truck was backing and realized that if it continued in its course, it would strike the vibrator machine, and that he therefore called to Powell to drive a little to his left and thus avoid the vibrator. Powell says that Bennett not only called to him to go to the left but that he also signalled to him that it was safe to continue the backing operation, and that though he could not see what was in the rear of his truck, particularly what was in the rear of the right hand side of his truck, he continued this backing movement because he thought it was safe to do so, since Bennett had so signalled him.
Powell says also that it was always customary for an employee of Boh Bros. to guide these trucks in their backing movements, and that he always sounded his horn to attract the attention of a Boh Bros. employee and that then one of them always guided him out. In this he is corroborated by another driver of Jahncke Service, who says that it was customary for the Jahncke drivers to sound their horns and for an employee of Boh Bros. to guide them in the backing movement.
Powell admits that Bennett had never before guided him out and it seems that the employee who had done this on many previous occasions was Henry Wallace, another employee of Boh Bros.
It is the contention of Jahncke Service, Inc., and of its insurer that it was understood between Boh Bros. and the Jahncke Company that Boh Bros. would furnish an employee to guide the Jahncke trucks in this backing movement and that, in addition to this understanding, it was always customary in such operations that this be done.
On behalf of Boh Bros. and its insurer, it is strenuously denied that there was any such understanding and it is denied that there was any such established custom, though it is admitted that on frequent occasions employees of Boh Bros. had performed this service.
On behalf of Jahncke Service, Inc., and of its insurer, it is contended that, in relying on this custom, and particularly in relying upon the signals which Powell insists were given to him by Bennett, Powell was acting as a reasonably prudent operator of a truck would have done, and that, therefore, there was no negligence on his part, and consequently, there is no liability in the Jahncke Company or in its insurer.
Plaintiff answered this contention by maintaining that if there was such a custom or such an agreement and if, under it or, in fact, if, in the absence of such a custom, an employee of Boh Bros. undertook to guide *741 the truck out of the lot and did so negligently, not only were Boh Bros. and its insurer rendered liable, but also the Jahncke Company and its insurer were liable because the employee of the Jahncke Company, in undertaking to carry out the dangerous maneuver of backing out of the property on which numerous workmen were employed, had no right to rely upon instructions of the Boh Bros. employee, but should have himself made certain that it was safe to do so.
Counsel for Boh Bros. maintain that even if, on prior occasions, an employee of Boh Bros. had guided Jahncke trucks out of the runway and even if, on this occasion, Bennett did signal Powell to continue the backing movement, the employee did so merely as a spontaneous effort on his part to help the Jahncke employee, and that this did not render his own employer, Boh Bros. liable. And, particularly, Boh Bros. deny that Bennett gave any signal except that he warned Powell to move a little to the left so as to avoid the vibrator.
As we have said, the record is voluminous. Numerous witnesses testified and written statements were taken in advance from many of them.
We conclude that there was no agreement, express or implied, between the Jahncke Company and Boh Bros. that Boh Bros. would furnish an employee to guide each truck out of the lot. We conclude also that, although there was no such agreement, very often a Boh Bros. employee, on seeing a Jahncke truck about to back out of the lot would undertake to help its driver in the backing movement, and we conclude also that on the particular occasion in question Bennett, the Boh Bros. employee, did not signal Powell to continue the backing movement but merely warned him not to strike the vibrator.
We reach this last conclusion not only after carefully analyzing all of the evidence, but because we feel that it is inconceivable that Bennett would have been standing where he was, with a clear view of Gibson and deRoode, who was in a stooping position back of the truck, and would have signalled the truck to back down upon them, and would not have first warned them and would not have also warned Powell to stop the truck until they could move to a position of safety.
There can be no doubt that the truck driver, Powell, undertook an exceedingly dangerous operation. There were numerous employees on the premises, any one of whom might have been endangered and, in fact, the entire argument of the Jahncke Company is that the movement was so dangerous that it was necessary that each driver secure the help of one of the employees of Boh Bros. before backing his truck.
It was conceded that any person in the rear of the right side of the truck would be screened from the view of the driver by the large concrete mixing drum which formed the body of the truck.
Since the runways on which the wheels of the truck were required to be kept were only about 30 inches in width, it is obvious that the double wheels on the rear of each side of the truck were so wide that if they were to be kept on the runways, there could be very little lateral movement as the truck was backing. This made it necessary that the driver of the truck look out of the left side door of the body and focus his attention on the left rear wheel in order that he might prevent it from leaving the narrow runway. If, then, a driver undertook to execute this backing movement unaided, it was the grossest negligence to do so without making certain that there was no one in the rear who might be hurt.
Since we have concluded that Bennett did not give to Powell the signal that all was clear, but merely warned him to avoid striking the vibrator machine, the action of Powell in attempting to back out of the driveway was negligence.
We next consider the question of whether the fact that some employee of Boh Bros. had, on numerous previous occasions, aided the Jahncke trucks in backing out of the driveway, coupled with the fact that on this occasion no employee did so, could be said to constitute actionable negligence chargeable to Boh Bros. If, even without a contract or informal agreement that such help would be furnished, it had *742 been shown that such help was always provided as a matter of custom and that on the occasion in question the assistance had been furnished, but that the employee who furnished it and undertook to guide the truck out had negligently given the back-up signal when it was not safe for the truck to back, there would be presented a very interesting question rather difficult of solution. That question would have been primarily whether Boh Bros. would have been responsible for negligence of an employee in connection with a voluntary act which he was not required to perform, and secondly, the question would have been whether the driver of the truck, relying on the signals of some third person, had done all that a reasonably careful and prudent driver should have done. But we do not find that that question is presented here, for we find that even if such a custom has been established, it was on this occasion not followed and that no employee of Boh Bros. undertook to guide the truck. Therefore, the most that can be said is that Boh Bros. was at fault only in failing to provide someone who, under the custom, should have assisted the driver in backing out of the runway. If there was such a failure, we think it would not render Boh Bros. liable. Powell, if he did blow his horn for assistance, should have waited until someone could come and give him the assistance requested. He should not have continued his backing movement without it. The fault consisted not in the passive failure of Boh Bros. to furnish that assistance but in the active negligence of the Jahncke driver in proceeding without it.
We pass then to a consideration of the question of whether plaintiff was himself at fault in not noticing that the truck was backing towards him. It is pointed out by counsel for defendants that only a few minutes before the occurrence of the accident plaintiff had not only seen the truck enter and proceed to the place at which it had discharged its contents but that he had receipted for those contents and had then taken a position only a few feet away and had remained on the driveway over which he knew that the truck must be backed after it had unloaded the liquid concrete.
All of these things are true, but we nevertheless feel that the plaintiff should not be charged with negligence in not noticing that the truck was backing down upon him. He was engaged at his work; his attention was directed at the concrete, and he was discussing with Gibson, the other employee, the condition of that concrete.
The district judge, in his written reasons for judgment, discussed this question, and we agree with what he said:
"In order to hold plaintiff contributorily negligent under the facts and circumstances of this case, I must first hold that when he went on the site to perform his duties for his employer, he placed himself in a trap, the prey of the negligence of all others present, and that he could only survive at his peril. Such a situation is unthinkable.
"Defendants have cited the case of Duke v. Dixie Building Material Co., [La.App.] 23 So.2d 822, where the plaintiff was denied recovery because of his contributory negligence in placing himself behind a truck similar to the one in this case. The cited case is inapposite because there the plaintiff actually saw the truck backing slowly, notwithstanding which he placed himself in the spot towards which the truck was backing. He knew from the nature of the chute, that apparently struck him, that it would swing upon the least jolt. He likewise knew that, in standing on the side opposite to that on which the driver sat, the driver could not see him, either by looking backwards or by looking into the rear-view mirror.
"In the cited case plaintiff actually saw the oncoming truck and had an opportunity to protect himself. Here plaintiff had his back to the truck, perfectly oblivious to what was going on and had no knowledge or notice of the impending danger.
"In Daughtry v. Cline, 224 N.C. 381, 30 S.E.2d 322 [154 A.L.R. 789], the plaintiff was engaged as a civil engineer, and while inspecting the grade of a taxiway, prior to placing asphalt thereon, was injured by the backing of a truck over him. It was defendant's business to get the grade *743 satisfactory for surfacing and in order to do this, it was necessary for him to sprinkle the surface with a sprinkler on trucks. While the plaintiff was `squatting down' to determine a level on the taxiway, the driver of defendant's sprinkler truck backed the truck over plaintiff from the rear, seriously injuring him. In answer to the plead of contributory negligence, the Court said:
"`There are a number of cases which hold that where a plaintiff is so absorbed in the performance of his duties as to render him oblivious of danger and this obliviousness to danger is apparent, or should, in the exercise of due care, have been apparent to defendant, the defendant is thereby charged with the duty of using due care to avoid injuring plaintiff, and the plaintiff is not guilty of such contributory negligence as would bar him from recovery against the defendant for not exercising due care to protect himself from the danger which was obvious or should, in the exercise of due care, have been obvious to the defendant.'"
We repeat that plaintiff was required to examine the concrete as it was being poured. He found it necessary to talk to Gibson and to stoop over and to inspect the material, and, under the circumstances, he would have been justified in assuming that trucks entering or leaving would be careful not to strike him or any employee, otherwise he could not have attended properly to his work, as it would have been necessary for him to have been constantly on the alert. He should not be barred from recovery on this ground.
Our conclusion is that the Jahncke Company is solidarily liable in the full amount of the damage sustained by plaintiff, and that its insurer, The Employers' Liability Assurance Corporation, Ltd., is solidarily liable to plaintiff up to the policy limit of $25,000.00. The amount for which each is liable to the intervenor will now be discussed.
Counsel for Jahncke Service, Inc., and The Employers' Liability Assurance Corporation, Ltd., presented a very interesting argument, based on the fact that the amount expended for hospital, medical, nursing and other similar bills was largely in excess of the maximum amount for which the employer, Pittsburgh Testing Laboratory, under the Louisiana Workmen's Compensation laws would have been liable, and that none of those amounts were paid by plaintiff himself. The contention is very ingenious and, if sound, might prevent recovery by either the plaintiff himself or by the intervenor of so much of that item as is in excess of the $500.00 maximum, limit for which an employer or his insurer is liable under the compensation law.
The first point sought to be made is that the intervenor has not been subrogated to the claim of plaintiff except insofar as subrogation results from the compensation statutes. It is interesting to note that in the statute as originally enacted in 1914, no subrogation was provided in favor of the insurer of the employer for such amount as the insurer might pay to the insured employee. That subrogation has now been provided as appears from Louisiana Statutes AnnotatedRevised Statutes 23:1162, which, in part, provides: "The insurer shall be subrogated to all rights and actions which the employer is entitled to under this Chapter."
Accordingly, we must next determine what is the extent of the right to which the employer is automatically subrogated under the compensation law.
It is not denied that this right of the employer to subrogation includes the right to recover from the third person who may be at fault the amount which the employer has paid or for which he may be liable for compensation and the amounts which he has paid or may be liable for for medical and other related expenses not in excess of $500.00.
It is contended on behalf of the intervenor that, though the employer is not responsible under the statute for such medical and related expenses in excess of $500.00, the employer may, by agreement, make himself liable for any amount necessary, and that, since the employer here obtained from its insurer, the Liberty Mutual Insurance Company, a policy with unlimited medical coverage and the employer then contracted for medical and reasonable expenses *744 largely in excess of the $500.00 limit fixed in the act, the employer could, by subrogation, have recovered the entire amount and that consequently the insurer of the employer has been subrogated up to the full amount expended by the employer or for which the employer might become liable.
The statute, LSA-RS 23:1203, provides that the employer must provide "reasonable" medical, surgical and hospital service and medicines not in excess of $500.00, and the employer unquestionably has the right to recover up to $500.00 from the third person who may be at fault for such items, and the employer also has the right to recover for such compensation as he may be liable for, for in Louisiana Statutes Annotated Revised Statutes 23:1101 it is provided: "Any employer having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or become obligated to pay as compensation to any injured employee or his dependent."
We think, however, that the statutory provision cannot be interpreted as including any sums in excess of those for which, under the act, the employer is mandatorily liable and should not be held to include any other amounts or sums for which he may, by contract or agreement, voluntarily make himself liable. The employer could, of course, pay such additional amounts and, by conventional subrogation from the employee, obtain the right to demand those amounts back from the person at fault, but it is not shown here that there has been any such conventional subrogation.
It is true that in the policy which the employer secured from its insurer, Liberty Mutual Insurance Company, the intervenor, it was provided that the Liberty Mutual should be subrogated to all the rights of the employer, but when the additional amounts were paid, no conventional subrogation was taken from the employee himself, and since the right to recover for the amounts expended existed primarily in the employee, it was from the employee that the subrogation should have been secured.
It is contended also that the employee himself cannot recover for those additional medical expenses, since they were neither paid nor contracted for by him but were contracted for by the employer or by the employer's insurer. The argument is that since the employer did not become obligated for these expenses, he did not sustain that loss and cannot recover on that particular part of his claim.
This contention overlooks the well settled principle that an injured party, or one who sustains a loss as the result of the negligence of another may recover the full amount of his loss from the tort-feasor, even though the loss is partially or wholly made good by an insurer.
In Dupuy v. Graeme Spring & Brake Service, Inc., La.App., 17 So.2d 490, 492, after citing many authorities, we said: "The authorities are to the effect that where a plaintiff brings an action of this character he may bring the suit in his own name, notwithstanding the fact, that he has been paid by a third person, such as an insurance company, a part of his claim and that he may maintain such an action even though a subrogation has been had by the insurer." See, also, Hanton v. New Orleans & C. R. Light & Power Co., 124 La. 562, 50 So. 544.
In 25 C.J.S., Damages, § 99, p. 647, it is said that: "The wrongdoer is not entitled to have the damages to which he is liable reduced by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him. Under this general rule, insurance in behalf of the injured person cannot be set up by the wrongdoer in mitigation of the loss."
And on pages 648, 649 of 25 C.J.S. appears the following: "So, also, the damages generally cannot be mitigated or reduced by the fact that plaintiff has received, or is entitled to, compensation or benefits under the Workmen's Compensation Act, * * *."
The same rule is set forth in 15 Am.Jur., Damages, sec. 201, page 617, as follows: "It is well settled that the damages recoverable for a wrong are not diminished by *745 the fact that the party injured has been wholly or partly indemnified for his loss by insurance effected by him and to the procurement of which the wrongdoer did not contribute."
Therefore, the plaintiff is entitled to recover the full amount of expenses which were made necessary by the accident even though, because of the insurance carried by his employer, these expenses were paid by the insurer of his employer.
Our conclusion, therefore, is that the Jahncke Service, Inc., is solidarily liable to plaintiff for the full amount of his loss out of which there must first go to the intervenor such amounts as the employer would have been liable for under the compensation laws of Louisiana, and that The Employers' Liability Assurance Corporation, Ltd., is similarly liable solidarily but only up to the maximum amount of its policy, $25,000.00.
We pass on then to a consideration of what is the loss sustained by plaintiff, in other words, what was his damage.
That his physical injuries are most serious is made evident by the fact that, as found by the district judge and as disclosed by the record, his actual expenses up to the time of the trial in the district court amounted to $12,072.23. In addition to this he lost his watch and clothing valued at $45.00, making a total actual loss at the time of trial amounting to $12,117.23. In addition to this it was shown that it would be necessary for him, as the district judge said, "in the foreseeable future * * * to submit to another operation necessitating additional expenses * * * reasonably estimated * * * at the sum of $1150.00."
The district judge discussed in detail the physical injuries sustained by plaintiff, and we think that his statement is substantiated by the record:
"At the time of his injury plaintiff was 67 years old and in reasonably good health for a man of his age, with a life expectancy of 10 years. As an inspector for the Pittsburgh Testing Laboratory, he earned an average of $50.00 per week. The wheels of the truck passed over and crushed him in his pelvic region and he suffered severe shock and sustained multiple fractures of the pelvic girdle, including marked comminuted fractures of the right pelvic girdle and fractures of the pubic and ischial rami with separation of the symphysis pubis and marked widening of the sacro-iliac joint with upward displacement of the ilium, rupture of the urethra with internal hemorrhage, a subtrochanteric fracture of a severe type involving the left femur, crushing injuries to both lower legs, including a fracture of the internal malleolus of the left tibia, and multiple contusions of the abdomen, pelvis and legs.
"The serious and multiple character of his injuries necessitated serious operations, difficult and skillful orthopedic and urological and other medical treatment. On the day of the accident plaintiff was taken in an ambulance to Charity Hospital where he remained until November 9th, 1948, when he was transferred to Touro Infirmary, and remained there until April 13th, 1949. He was then taken home where he had to stay in bed and continue under the treatment of his doctors until May 14, 1949. He was then taken back to Touro Infirmary where he remained until May 24, 1949 and on that date was taken back to his home where he is still under treatment of his doctors and where he is still confined as a result of his injuries in the said accident. Plaintiff will be permanently and totally disabled as a result of said injuries which will necessitate medical and surgical treatment for the remainder of his life. Since the date of the accident he has been constantly under treatment of doctors, viz, Irvin Cahen, Eugene B. Vickery and Lawrence W. Burt."
The district judge found that he had been totally permanently disabled and allowed him $10,400.00 for this total permanent disability. He said that though deRoode had a life expectancy of ten years, his recovery for permanent total disability should be limited to four years. He also allowed him $15,000.00, in addition to his loss of earning ability and, in addition to his expenses, for pain and suffering.
It is seriously argued that there should be an increase in the total award and particularly that the amount allowed *746 for permanent total disability should be increased. We have given very serious consideration to this question but have reached the conclusion that the total amount awarded, to-wit $38,667.23, is not inadequate, taking into consideration previous awards in other cases and also taking into consideration the decrease in the purchasing power of the dollar.
Intervenor, the insurer of the employer, at the time of the trial had paid $2,580.00 in weekly compensation and, according to the record and so far as we know, has been paying compensation at the rate of $30.00 per week since the judgment was rendered. The intervenor is entitled to recover back these amounts and also to recover up to $500.00, the amount paid for medical, hospital and other related items.
Accordingly, the judgment appealed from insofar as it runs against Boh Bros. Construction Company, the individual members, Arthur Boh and Henry P. Boh, and their insurer, The Travelers Insurance Company, is annulled, avoided and reversed and plaintiff's suit as against these defendants is dismissed at his cost.
And it is further ordered, adjudged and decreed that the judgment in favor of plaintiff and against Jahncke Service, Inc., and its insurer, The Employers' Liability Assurance Corporation, Ltd., be and it is affirmed. The judgment insofar as it runs against The Employers' Liability Assurance Corporation, Ltd., is limited to the sum of $25,000.00.
And it is further ordered, adjudged and decreed that out of the said judgment, intervenor, Liberty Mutual Insurance Company, shall be paid by preference and priority the sum of $2,580.00, together with such compensation payments as may have been made by intervenor to plaintiff prior to the date of the payment of this judgment, and that the said intervenor shall also be paid and receive out of said judgment medical expenses in the sum of $500.00. For the remainder of the amount spent for medical and related expenses intervenor must look directly to the plaintiff.
It is further ordered, adjudged and decreed that the balance of the amount of the judgment, after the payment of the aforesaid sums to intervenor, be paid to and received by the plaintiff, Roger deRoode.
It is further ordered, adjudged and decreed that upon payment of the said judgment, apportioned between plaintiff and intervenor as aforesaid, intervenor shall be discharged of and from all further liability to plaintiff for workmen's compensation pursuant to the provisions of the Louisiana Workmen's Compensation Act, LSA-RS 23:1021 et seq.
All costs except those of Boh Bros. Construction Company and the individual members thereof, Arthur Boh and Henry P. Boh, and The Travelers Insurance Company, are to be paid by defendants, Jahncke Service, Inc., and The Employers' Liability Assurance Corporation, Ltd.
Reversed in part; amended and affirmed.