250 So.2d 135 (1971)
Joseph P. BARROIS
v.
SERVICE DRAYAGE COMPANY, Inc. d/b/a Ryan Crane Service et al.
No. 4299.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1971.
Rehearings Denied July 15, 1971.
*138 Dillon & Williams, Gerald M. Dillon, New Orleans, for defendants-appellants.
Porteous, Toledano, Hainkel & Johnson, William A. Porteous, III, New Orleans, for appellees-appellants.
Robert J. Young, Jr., New Orleans, for intervenor.
Little, Schwartz, & Dussom, John Pat Little, Charles Schwartz, Jr., Michael F. Little, and James M. Colomb, Jr., New Orleans, for plaintiff-appellee.
Before CHASEZ, REDMANN and BOUTALL, JJ.
*139 BOUTALL, Judge.
This is a suit for bodily injuries as a result of an accident in which plaintiff received severe electrical shock and burns while engaged in removal of a large tank from his place of employment. A jury trial resulted in a verdict for plaintiff against all defendants. From the judgment based thereon, the defendants appeal.
The plaintiff alleges that on May 25, 1966, while in the employ of General Dynamics Corp., Liquid Carbonic Division, he was called upon to point out to an employee of Service Drayage Company, Inc., d/b/a Ryan Crane Service, a large CO2 tank which was to be removed from the General Dynamics Corp. yard. This tank was to be lifted by a Service Drayage Company crane and placed aboard a truck owned by Jos. Ribaul Transfer. He alleges that since the operator of the crane, Lawrence Bersuder, came alone, he and Benjamin Struggs, the truck driver of Ribaul's truck, assisted the crane operator by attaching the hooks of the load cable leading from the boom of the crane to the tank which was to be lifted. While they were engaged in fastening the chains to the tank, the crane came into contact with an overhead high voltage electric line causing plaintiff to be severely burned.
In his original petition, plaintiff alleges the negligence of Bersuder, the crane operator, and sues, as parties defendant, the crane company and its insurer, Service Drayage Co., Inc., d/b/a Ryan Crane Service, and Phoenix Insurance Company. In his supplemental petition, he alleges that the owner of the truck, Jos. Ribaul Transfer Co., Inc., was insured by Fireman's Fund Insurance Company (for whom The American Insurance Company was later substituted) under a policy containing a "loading and unloading" clause, and that Bersuder, the crane operator, came under the provisions thereof as an "omnibus insured" during the process of loading the tank onto the truck. He then made the insurance company, now The American Insurance Company, a party defendant in solido.
There was an intervention filed by Insurance Company of North America, the workmen's compensation insurance carrier of General Dynamics, against the same defendants for the amount paid under its policy on behalf of the plaintiff. The defendants, Service Drayage Co. and Phoenix Insurance Company, answered, alleging some special defenses, and filed a third party petition against The American Insurance Company and General Dynamics Corp. The defendant, The American Insurance Company, answered all pleadings and alleged special defenses. General Dynamics Corp. filed a motion for summary judgment to the third party petition of Service Drayage and Phoenix, and was dismissed from the suit.
Trial was had before a jury which rendered a special verdict, finding that (1) Bersuder was negligent and his negligence was a proximate cause of the accident; (2) Barrois was not negligent; (3) Bersuder was not a borrowed servant of General Dynamics Corp.; (4) Barrois was not a borrowed servant of Service Drayage Company; (5) at the time of the occurrence of the accident, the truck insured by American Insurance Company was being loaded; (6) Barrois' damages amounted to $175,000.00. The judge thereupon rendered a judgment in favor of plaintiff against all defendants in solido in that amount, limiting Phoenix to its policy amount, further granting recovery to intervener and granting recovery to third party plaintiffs, Service Drayage and Phoenix, against third party defendant, American, for such amounts as they may pay under the judgment. All defendants appealed.
There are a number of issues raised by the various parties on this appeal. The basic issue is the finding of the jury that Bersuder's negligence was the proximate cause of the accident. This largely determines the relevancy of the other issues to a final determination of the *140 case. As is usual in a case where there are a number of witnesses, there are conflicts in testimony which must be resolved by the finder of facts. The reasons for the conflicts are as varied as the conflicts themselves, and, of course, there is no certain way in which the appellate court can read the mind of each individual juror in his determination of the facts of the case.
In this case, the testimony of Bersuder is in conflict not only with the testimony of the other witnesses, but also in conflict within itself. Its variance from positive fact and from the preponderance of the evidence makes it unworthy of belief. For example, Bersuder testified that the electric wire was 12 to 15 feet above the ground, yet, the evidence presented by representatives of New Orleans Public Service, Inc., shows the distance to be 31 feet. This is not simply an error in estimating distance because Bersuder knew precisely how long the boom of his crane was (40 feet plus 5 feet height of platform). He originally stated that he placed the top end of the boom 2 feet away from the wire, and, upon being asked to explain the discrepancy in distance, he changed his testimony and placed the wire abreast of the middle section of the boom. (Tr. 54-55). The chart for this crane placed in evidence as "Ryan Crane # 1" shows the height of the top of this boom above the ground is 34 feet at an elevation of 45. The importance of these measurements can be immediately realized when one considers that Bersuder's explanation of the accident is that plaintiff or Struggs pulled the cable into the electric power line. The block hook at the end of the cable weighed about 450 pounds plus the weight of the chains and cable and one or two men may possibly pull it sideways so that the cable could move some 2 feet at about the midsection. It is a sheer impossibility to move the chains and block hook far enough sideways so that the top end of the cable, hanging from a boom only 3 feet above the electric power line, could move 2 feet sideways.
A line (the cable) suspended from a fixed point (the top of the boom) and running to a perpendicular base (the ground) would form a triangular figure when moved along the base. Not even considering that the cable is flexible and not a rigid line, the application of simple mathematical and geometric formulae demonstrates that to move a point on the cable 3 feet from the apex or boom a distance of 2 feet on a perpendicular plane would require moving the cable, 34 feet long, a distance in excess of 22 feet along the ground. See Chaney v. Brupbacher, 242 So.2d 627 (La. App. 4th Cir., 1970) for a similar application. Considering that the cable in question is in reality flexible, and that there is concededly a 450 pound weight near the end thereof, the impossibility of this event becomes obvious. Contact with the electric power line could only be made by the movement of the boom itself.
Another important conflict with provable fact is Bersuder's measurements of the tank that was to be moved. He testified that the tank was 4 feet in diameter and 8 feet long. (Tr. 27-28). The actual measurements of the tank were 5 feet wide, 6 feet high and 18 feet long. (Tr. 252-53). Here again it is important to consider if this is simply miscalculation or a deliberate distortion of fact. He testified that a third of the tank was protruding from beneath the electric wire towards the crane. (Tr. 35). Therefore, he placed the boom and cable 2 feet from the electric wire to shift the tank. His measurements thus correspond to his actions. However, the measurement of 18 feet, the length of the tank, causes a protrusion of 6 feet and there is no necessity to bring the boom 2 feet from the electric power line.
There were two very important conflicts in Bersuder's testimony itself. Early in his testimony Bersuder stated that he had locked his boom in place after positioning it. As he testified the second time to locking it, he was confronted with a prior inconsistent statement and when explanation *141 was sought, he changed his testimony and admitted that the boom had never been locked at any time before the injury. (Tr. 52-53). Additionally, Bersuder testified that the first time he saw Struggs before the injury was when Struggs and plaintiff began to pull the chains immediately before the electricity hit. When later confronted with another prior inconsistent statement concerning this, he again changed his testimony and admitted to having seen Struggs before that time and before they began the loading operation. (Tr. 62-63). The evidence shows that he had Struggs move his truck so he could get his crane into position.
Certainly the jury could not have placed much value on the testimony of this witness, who can be discredited on almost every material fact of the accident. The main items that stand out in Bersuder's testimony are his admissions that he placed his crane's boom and cable within 2 feet of the power line, that he did not lock the boom to keep it from moving, and that he did not open the hatch on the top of the cab to give him clear visibility overhead.
Moving to a consideration of all of the evidence presented, we conclude, as did the jury, that Bersuder was negligent and that his negligence was the proximate cause of the accident. We believe it to be negligence to place his boom and cable so close to the high power line without locking the boom and ensuring that the boom and cable could swing no closer. Additionally, he was engaged in performing this operation with restricted visibility overhead and with inexperienced persons handling the hook up of the chains to the tank. We find ample evidence to support the jury's verdict of negligence. There is no manifest error.
The second issue presented by the jury's verdict is its finding that there was no negligence on the part of the plaintiff, Barrois. Defendants contend that plaintiff was contributorily negligent and that he assumed the risk in this dangerous operation.
The record shows that plaintiff was well aware of the existence of the electrical power lines and that they carried high voltage current. He also knew that the tank was located beneath the wires. Logically, it follows that he must have realized that the boom would be somewhere near the wires during the operation. However, it is not an assumption of the risk per se to work in the vicinity of high voltage electricity nor is it negligence per se. Potts v. Shreveport Belt Ry. Co., 110 La. 1, 34 So. 103 (1903); Clements v. Louisiana Electric Light Co., 44 La.Ann. 692, 11 So. 51 (1892); Myhan v. Louisiana Electric Light and Power Co., 41 La.Ann. 964, 6 So. 799 (1889). What the plaintiff could not know was that the crane operator did not have the boom locked so it could not move in the direction of the wire, but, instead, had his hands on the control lever which moved the boom. Because Bersuder was the crane operator who had handled the loading and unloading of tanks in this yard so many times before, plaintiff could only assume that Bersuder was a competent operator who would carry out the operation safely.
A person does not have to anticipate the negligence of a co-worker. Ford v. Tremont Lumber Co., 123 La. 742, 49 So. 492 (1909). He may assume that others who owe him a duty of care will exercise that care and that he will not be exposed to nor threatened by danger which can come to him only from breach of that duty of care. Allien v. Louisiana Power and Light Co., 202 So.2d 704 (La.App. 3rd Cir., 1967); Vogt v. Hotard, 144 So.2d 714 (La.App. 4th Cir., 1962).
In connection with the alleged negligence of Barrois, there is some testimony that Barrois may have pulled the crane's cable into the electric power line, and evidence that the boom could have swung into the electric power line. Had the boom been locked in position, there may be some justification for finding fault upon Barrois, but certainly here there is a *142 preponderance of evidence in his favor and the jury so found. The attention of the three chief witnesses was focused on the hooking up of the tank and no one was looking upward at the power line until after contact with it was made. It was then that Struggs, who was saved from severe injury because he wore rubber gloves and rubber shoes, yelled to Bersuder to move the boom away to break contact. Facts need only be proven by a preponderance of the evidence and the trier of fact must weigh and sift all of the evidence to determine what it believes to be true. There is sufficient evidence in this case to justify a verdict that Barrois was not negligent, and the verdict of the jury should not be disturbed unless there is a showing of manifest error. LSA-Const. Art. 7 § 29; Mayes v. McKeithen, 213 So.2d 340 (La. App. 1st Cir., 1968), writ refused 252 La. 965, 215 So.2d 130 (1968); Certiorari denied, 396 U.S. 868, 90 S.Ct. 108, 24 L.Ed.2d 121 (1969).
The next issue is the correctness of the jury's verdict that the parties were engaged in loading the Ribaul truck, which was insured by The American Insurance Company.
The jury in its unanimous verdict found that Ribaul's truck, insured by American, was in the process of being loaded with the CO2 tank at the time plaintiff was injured. As a result thereof, plaintiff asserts that the provisions of the American policy place Bersuder within the coverage thereof in favor of plaintiff, under the following sections of the policy (see Exhibit American #1):
"INSURING AGREEMENTS
I. COVERAGES
A. Bodily Injury LiabilityAutomobile.
To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of ownership, maintenance or use of any automobile.
* * * * * *
III. DEFINITION OF INSURED
The unqualified word `Insured' includes the named insured * * * and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. * * *
* * * * * *
CONDITIONS
3. DEFINITIONS
(f) Purposes of Use
* * * Use of an automobile includes the loading and unloading thereof." (Emphasis added.)
Defendant, American, on the other hand claims that its insured truck was not, at the time of the accident, being loaded; and therefore, plaintiff is not entitled to recovery from its company. There is no contention that the truck was not covered by the policy.
There have been several cases in Louisiana interpreting the loading and unloading provisions of insurance policies such as this. Our courts have declared that such provisions expand the coverage afforded beyond the actual driving or parking of the vehicle insured so as to cover some acts in which the vehicle does not itself play any part; that is, the vehicle is not moving but at rest, and some objects are being moved onto or off of the vehicle. Spurlock v. Boyce-Harvey Machinery, Inc., 90 So.2d 417 (La.App. 1st Cir., 1956).
There are several legal doctrines which have been applied by courts in determining whether a particular factual situation *143 comes within the insuring provisions, however, an absurd result can be reached by applying one or the other, according to the factual situation presented. The rule to be applied in Louisiana is stated in the case of Fertitta v. Palmer, 252 La. 336, 211 So. 2d 282 (1968):
"Our function is to interpret the policy as a whole and to determine whether the negligent act which caused the injury was a natural and reasonable consequence of the use of the truck within the contemplation of the parties negotiating the insurance contract."
The court decided that the proper approach is the application of common sense, saying:
"This simply means that the court should decide whether, under a particular set of facts, the act causing the injury constituted a part of the `unloading' process as that term is commonly understood."
This applies equally as well to the "loading" process involved here.
The uncontroverted facts are that the Ribaul truck, which was to be loaded, had pulled into position near the tank to be loaded, and the crane operator, Bersuder, had ordered it pulled away some distance to enable him to get the space necessary to position the crane and lift the tank into the air. While the truck driver, Struggs, moved the truck, Bersuder and the plaintiff, Barrois, raised one end of the tank and placed a piece of wood under it. Then the truck driver pitched in to assist in hooking up the tank so it could be moved and lifted to place it on the truck. At this point the injury occurred. It is clear that the three men had only one purpose and were engaged in one activity, to load the tank onto the truck. The activity of loading had commenced. Bersuder was operating the crane, the truck was waiting nearby and the truck driver and plaintiff were hooking up the chains to move the tank.
The only fact in contention is the actual location of the truck. Some witnesses place it right next to the crane or tank, and others place it varying distances away. It is not necessary that there be a finding that the truck was a certain amount of feet from the tank, although there is sufficient evidence for the jury to have so found. It is sufficient that the truck was in loading position as directed by Bersuder to best enable him to load it with his crane. We conclude, as did the jury, that the truck was engaged in loading and that the policy issued by American provides coverage for Bersuder's liability for the injury.
The other appellants in this case, Service Drayage Company and the Phoenix Insurance Company, raise an additional issue to those already discussed. They contend that there was reversible error in the special verdict of the jury finding that Bersuder, the crane operator, was not the borrowed servant of Liquid Carbonic Division of General Dynamics Corporation.
The leading Supreme Court decision concerning the borrowed servant doctrine is Benoit v. Hunt Food Co., 219 La. 380, 53 So.2d 137 (1951). This opinion reviews at length the jurisprudence concerning the borrowed servant doctrine. Benoit finds that the proper test is the right of control, thus determining in whose business the servant was engaged at the time of the injury. Moreover, the general employer (in this case, Service Drayage for Bersuder) is presumed to be and remains the employer. In order to overcome this presumption, defendants must show otherwise at the particular time of the injury. A mere showing of a division of control is not sufficient to bear the burden.
In discussing the right of control, Benoit points out that the relationship of control, or right to control, between the original employer and the employee must cease, or be suspended, and that the new employer must assume the control, or the right to control. Necessarily, the intention of the parties is of paramount importance to the formation of the relationship.
*144 The facts in Benoit are relevant to the instant case. In Benoit, the plaintiff's employer contracted with a third party for welders to make certain repairs to employer's property. The welders were supplied with all of their materials and equipment. All plaintiff's employer did was direct them as to what to do, and was billed according to the time actually spent on the job by the welders. Plaintiff was injured by a negligent act of one of the welders. Suit was filed against the welder's employer, which, among other defenses, pleaded the borrowed servant doctrine. The Supreme Court of Louisiana in discussion of the facts pointed out that plaintiff's employer had two alternatives: (1) To hire welder employees on its own to perform their duties, or (2) to contract with others to perform them. When, as in both Benoit and the case at bar, the employer contracted with others and injury results, it must be determined who was the employer of the tort-feasor, i. e., who had the right of control. The Benoit court concluded that at all times the welders remained the employees of their original employer and did not become employees of plaintiff's employer. The fact that plaintiff's employer pointed out which work was to be performed and even instructed the negligent welder to perform the particular work causing the injury in a particular manner constituted cooperation in work, and not assumption of control.
In finding that cooperation in work to achieve a common purpose does not create a borrowed servant relationship, the Benoit court indicated that the change of control from employer No. 1 to employer No. 2 must become certain and complete before the doctrine can be invoked. In those cases cited by defendant, the facts bear out the conclusion that the negligent party was unequivocally under the control of someone other than his original employer. Such a finding removes them from any consideration in the instant case. There is no showing in the evidence in this litigation that General Dynamics supervisory personnel (or in any other manner) intended, tacitly or otherwise, to assume control of Bersuder. Likewise, there is no showing that Service Drayage relinquished, or intended to relinquish, control of Bersuder. This, of itself, substantiates the jury's conclusion that General Dynamics did not borrow Bersuder.
Bersuder's own testimony is very clear. In the absence of a trained leaderman, which plaintiff was not by Bersuder's testimony (Tr. 49, 59, 64), Bersuder took orders from his boss, Mr. Ryan. (Tr. 27). Bersuder took no orders from plaintiff, nor anyone else, at the time of plaintiff's injuries. Martin Locascio, General Dynamics' Supervisor, indicated to Bersuder and plaintiff which tank was to be loaded, and nothing else. (Tr. 30, 104). Certainly at the time of the injury, Bersuder had evidenced a positive intent not to be borrowed, and General Dynamics had evidenced no intent to borrow Bersuder.
The borrowed servant rule is based on the doctrine of respondeat superior and is founded primarily on the right to direct and supervise. Whether a person is a borrowed servant is an issue of fact properly presentable to the jury for its consideration. Danks v. Maher, 177 So.2d 412 (La.App. 4th Cir., 1965). This the jury did and unanimously found that Bersuder, at the time of the injury, was not the borrowed servant of General Dynamics.
Defendants have complained of certain specific errors alleged to have been committed during the course of the trial.
Specification No. 1 is that the court erred in permitting counsel for Service Drayage and Phoenix, over the objection of American's counsel, to cross-examine Willie Tate. (Tr. 232-235). Willie Tate was a co-employee of plaintiff and was subpoenaed as a witness for plaintiff. In the course of the trial, plaintiff's counsel announced that he was now aware that Tate's testimony would only be cumulative, but rather than risk the presumption that *145 the witness' testimony would be adverse to plaintiff's case, he called the witness to the stand and tendered him to the defendants for cross-examination. Counsel for defendants, Service Drayage and Phoenix, sought to cross-examine, and counsel for the co-defendant, American, timely objected. The objection was overruled and cross-examination was permitted.
Counsel for American relies on the case of State v. Swain, 180 La. 20, 156 So. 162 (1934) as authority for his objection. This case was a criminal case and the ruling therein was based on Art. 376 of the Code of Criminal Procedure (now LSA-R.S. 15:280) which provided that the adverse party may cross-examine on the entire case once the witness was sworn and testified to any material fact. For numerous and obvious reasons, proceedings in criminal courts are not conducted as proceedings in civil cases. Suffice it to say that in civil cases there is a presumption of adverse testimony by witnesses who are subpoenaed but not called upon to testify. White v. Plodzik, 213 So.2d 68 (La.App. 1st Cir., 1968). To negative this presumption, the witness is usually called and tendered for cross-examination. The opposing party may or may not cross-examine to determine the extent of the witness' knowledge. Certainly he has the right of cross-examination under our trial procedures. Lambert v. Bunge Corp., 169 So.2d 207 (La. App. 4th Cir., 1964). As stated in the case of Degelos v. Fidelity & Casualty Company of New York, 313 F.2d 809, 813-814 (5th Cir., 1963):
"* * * Our system of justice * * * being a mechanism for the resolution of man's disputes, the instrument of cross-examination is an integral part of that system in order to penetrate all of the conflicting impulses or obstacles to lay bare the whole truth. * * *"
We find no error in the court's ruling.
Defendant, American, further assigns as error the judge's charge to the jury relative to the issue of insurance coverage.[1] Defendant contends (Tr. 311-312) that the charge that, under the circumstances of this case, American would be the primary insurer whereas Phoenix Insurance Company would be the excess insurer is contrary to the principles stated in Spurlock v. Boyce-Harvey Machinery, Inc., supra.
That case held the two defendant insurance companies to be solidarily liable.
There was, however, a different factual situation, for in Spurlock, the court found that the liability of the automobile insurer rested only on the negligence of its omnibus insured, but that the liability of the other insurer rested not only upon the negligence of the employee but also upon the concurrent negligence of his employer.
In the instant case, there is no finding of negligence on the part of the employer, Service Drayage. There is only liability of Service Drayage on the theory of respondeat superior because of the negligence of its employee, Bersuder, and this liability is vicarious only. This difference is explained in Spurlock itself. See also Garvey v. Great Atlantic & Pacific Tea Co., 125 So.2d 634 (La.App. 4th Cir., 1961).
While we do not agree completely with the charge as given (Tr. 300) relating to any negligent action of Service Drayage Company, we cannot find serious error therein. A reading of the entire charge makes it clear that the court's charge applies to the finding of negligence against Bersuder and the special verdict form was *146 directed only to Bersuder's negligence, not Service Drayage Company's possible negligence apart from Bersuder. Additionally, the verdict and the judgment correspond to the law and the reference to Service Drayage Company is simply surplusage.
Defendant, American, further assigns as error the judge's refusal to give its requested charges Nos. 4A, 4B, and 10. An examination of No. 4A shows that, standing alone, it is not a complete statement of the law and would require some explanation so as not to be misleading.[2] We refer to our discussion of assumption of risk hereinabove. As to charge No. 4B, there is no evidence to support such a requested charge.[3] To give such a charge without some explanation could only serve to confuse the jury.
Charge No. 10 is a rather lengthy charge and concerns the interpretation of the "loading and unloading" clause of the automobile insurance policy. The judge gave the first part of the charge and refused to give the remainder, which consists of a series of specific factual findings and legal conclusions to be based on first finding that Bersuder "was actually using the truck at the time of the accident". We find that some of portions thereof are not correct statements of law, especially the first finding, some are simply argument, and some have been covered in the charges given by the judge. We concur in the refusal of the trial judge to give these charges.
Since the form and substance of a requested instruction must be such that the court may properly charge the jury in the terms of the request without qualification or modification, the court is not required to grant requests for instructions which need explanation, qualification, or modification. The general rule is that the court is not bound to correct, modify, or qualify erroneous requested instructions or give any others in their place or select from erroneous instructions what is right and reject what is wrong, although it is perfectly competent for it to do so if it sees fit. If a requested instruction is erroneous, faulty, or defective, it is properly refused, whether it is erroneous in whole or in part. It is likewise proper to refuse a series of instructions or propositions asked in gross, some of which are correct and others incorrect. Fleming v. Michigan Mutual Liability Co., 363 F.2d 186 (5th Cir., 1966); Baltimore & O. R. Co. v. Felgenhauer, 168 F.2d 12 (8th Cir., 1948); Carpenter v. Connecticut General Life Ins. Co., 68 F.2d 69 (10th Cir., 1933); Hanford v. Jan C. Uiterwyk Co., 214 So.2d 236 (La.App. 4th Cir., 1968); Guerra v. W. J. Young Construction Company, 165 So.2d 882 (La.App. 4th Cir., 1964).
Defendant, American, urges error in the use by the court of the form of special verdicts used and contends that the form submitted by it was improperly refused. The basic complaint here is directed toward special verdicts 3 and 4, all of the other special verdicts being nearly identical in language.
The court submitted the following:
"3. Was Joseph P. Barrois guilty of negligence? (Answer Yes or No)
4. If so, was his negligence a proximate cause of the accident? (Answer Yes or No)"
*147 The defendant requested the court to submit the following instead:
"3. Was Joseph P. Barrois guilty of assumption of risk or negligence? (Answer Yes or No)
4. If so, was his assumption of risk or negligence a proximate cause of the accause of the accident? (Answer Yes or No)"
Primarily, we see no error in the form actually used and find it consistent with the nature of the case as we previously discussed. There is no necessity to consider whether another form of special verdicts should have been used, even presuming it to be correct. Defendant's requested form was based on his special charges 4A and 4B which were properly refused.
Defendant further objects to the form of special verdicts because it contained no admonition that simply because there was provision for assessment of amount of damages the jury should not presume that damages must be awarded. The judge's charge to the jury clearly specified the grounds of liability and informed the jury that damages were assessable only if liability was to be found. There is no merit to the objections to the form of special verdicts.
The final issue is that of quantum. The jury awarded plaintiff the sum of $175,000.00. The appellants contend that this amount is grossly excessive and should be reduced.
The Supreme Court of Louisiana in the leading case of Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967), set forth the guiding role for appellate review of the award of judge or jury as to quantum. There the Supreme Court stated:
"We made clear in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, as extended in Ballard v. National Indemnity Company, 246 La. 936, 169 So.2d 64, and its companion cases, that a type of injury has little significance for determining the amount of damages, but that each case must be evaluated according to its own peculiar facts and circumstances as to the damage caused by that type of injury." 200 So.2d at 128.
"We recognize that in cases of this type the Constitution makes it the duty of appellate courts to review both the law and the facts, but in their examination of the fact these courts must give effect to the basic law set out in Article 1934(3) of our Civil Code that in the assessment of damages in cases of offenses and quasi offenses `much discretion must be left to the judge or jury'. This law is plain and means what it says, and it is the duty of all appellate courts to follow it. Under this rule the amount of damages assessed by the judge or jury should not be disturbed unless the appellate court's examination of the facts reveals a clear abuse of the discretion vested in the lower court." 200 So.2d at 131-132.
It is therefore necessary to examine the facts relating to plaintiff's injuries. As a result of his injuries, plaintiff was confined to Touro Infirmary three separate times. The first confinement began on the date of the injuries and extended through July 11, 1966, a period of forty-seven days. Five or six operations were performed on plaintiff during these seven weeks by Dr. Pierre Espenan (a general surgeon) and Dr. Richard W. Vincent (a plastic surgeon) for the purpose of debriding the burns, grafting and regrafting. (Tr. 157, 192). On January 12, 1967, plaintiff returned to Touro for a period of three days during which Dr. Espenan released a contracture under plaintiff's left arm and Dr. Vincent did repair surgery on plaintiff's right ear. Part of the ear had been lost as a result of the injuries. (Tr. 159-60, 192). Again on April 4, 1967, plaintiff returned to Touro for a period of three days during which Dr. Vincent completed the surgical rebuilding of the right ear. (Tr. 194-95). Between hospital confinements plaintiff went through various therapeutic treatments.
*148 Plaintiff suffered terribly from the burns about his body. Dr. Espenan testified that electrical burns are medically more serious than ordinary third degree burns. (Tr. 172). A mere glance at the photographs offered in evidence as "Espenan Exhibit Nos. 1 through 6", convinces the court of the suffering plaintiff went through, and which he will experience for the rest of his life. The record bears out plaintiff's testimony that he suffered great pain, which diminished over a period of months. (Tr. 266-270). However, at the time of the trial he was better, but still suffered recurring severe pains which came on him at various times with no particular pattern. (Tr. 269). Some of these pains, however, the doctors could not relate to the accident.
Dr. Pierre Espenan, stipulated by all parties as an expert in the field of general surgery, who treated plaintiff on behalf of his employer's compensation insurer, North American, left no doubt but that plaintiff was permanently and totally disabled. He testified that plaintiff had permanent impairment to his left hand, left shoulder and legs between fifty and sixty per cent. (Tr. 167-68). Dr. Daniel Riordan, an orthopedist, testified that the injuries to plaintiff's hand (left) were permanent. (Tr. 185). Plaintiff was a laborer with General Dynamics, and, of course, needed full use of hands, shoulders, and legs to carry out his employment.
Defendants offered no contradictory medical testimony, so it must be concluded that plaintiff will never be able to work again at his former employment. In fact, North American even sent plaintiff to a rehabilitation school in hopes that his physical condition would be improved so that he could possibly learn another trade. All of this was to no avail. Plaintiff was unable to undergo complete rehabilitation evaluation because of acute pain which prevented him from carrying out the program. (Tr. 268). Plaintiff only has a fifth grade education (Tr. 281), and was at the age of 40 at the date of the trial (Tr. 265). Certainly, plaintiff may be able to find some sort of limited employment (unskilled) in the future, but this is pure conjecture. As of the time of trial he was still unable to work because of great difficulty in getting in and out of a truck. (Tr. 269-70).
A successful plaintiff in an action in tort is entitled to compensation for the following damages, where proven in the evidence: (1) loss of past and future earnings; (2) past and future pain and suffering; (3) permanent disfigurements and disabilities; and (4) actual medical and related expenses. Brignac v. Pan American Pet. Corp., 224 So.2d 84 (La.App. 3rd Cir., 1969).
In the instant case, the plaintiff has already suffered medical expenses in the amount of $9,412.88 as of the date of trial, and there is before us now, the request of the intervenor to raise this amount to compensate for additional medical expenses since then. His loss of wages to date of trial amounted to $34,476.54.
Plaintiff produced an expert witness, J. K. Roberts, an actuary, to testify as to his future earning capacity. The witness, using an average wage of $7,888.00, with a 3% annual rise of cost of living and 5% discount factor, calculated his wages from time of injury to time of retirement at age 65 (26-27 years) to be $173,912.00. He calculated wages from time of injury to expected time of death (24-32 years) under the mortality tables to be $161,917.00. The finder of fact is, of course, not bound by such evidence, but it may be used as one of the elements worthy of consideration in assessing damages.
Considering these amounts mentioned above, it is easily noted that there is left only a small amount to consider in compensation for past and future pain and suffering, and permanent disfigurement and disability. In view of his severe pain and suffering and his present condition, we cannot say that the jury erred. There is beyond *149 doubt sufficient evidence to support the verdict and, accordingly, it should not be lowered by this court. Joyner v. Aetna Casualty & Surety Co., 240 So.2d 545 (La. App. 2nd Cir., 1970); writ granted, November, 1970.
There are two other questions which arise in these proceedings beyond the issues of the jury trial. The first of these is the ruling of the trial judge on a motion of summary judgment.
The defendants, Service Drayage Company and the Phoenix Insurance Company, filed a third party proceeding against Liquid Carbonic Division of General Dynamics Corp., plaintiff's employer, alleging negligence of General Dynamics and praying in the alternative for contribution and indemnification in the event defendants were cast in judgment. General Dynamics filed a motion for summary judgment alleging the employment of plaintiff by it, and urging the principle that its liability is restricted solely to workmen's compensation. It thus contends there is no liability in tort to the employee, and there cannot be liability either for contribution or indemnification to other tort-feasors. The trial judge maintained the motion for a summary judgment and dismissed General Dynamics from the suit.
The summary judgment was signed on October 17, 1967, and notices thereof were sent in accordance with LSA-C.C.P. art. 1913 on that day. A summary judgment is a final judgment and is considered to have the same effect as a regular judgment after trial. LSA-C.C.P. 968. While an appeal does not lie from a court's refusal to render summary judgment, an appeal from granting the summary judgment must be taken within the time and in the manner specified for final judgments. The delay for appeals is set out in LSA-C.C.P. 2087 for devolutive appeals and in LSA-C.C.P. 2123 for suspensive appeals.
These defendants, Service Drayage and Phoenix Insurance Company, did not file an appeal until May 25, 1970, long after the time of appeal from the summary judgment had run. Their petition for appeal only requests a suspensive appeal from the final judgment rendered on May 8, 1970, to which General Dynamics Corporation was not a party. The summary judgment cannot be considered on this appeal since it has become final at the expiration of the statutory period for taking an appeal. Brignac v. Transamerica Insurance Company, 220 So.2d 561 (La.App. 3rd Cir., 1969).
Finally, we are brought to a consideration of the judgment in favor of the intervenor, The Insurance Company of North America. Intervenor is the workmen's compensation carrier of plaintiff's employer, and it prays for payment of all such benefits paid to plaintiff or on behalf of plaintiff in connection with his injuries together with all future payments which might be made.
The parties stipulated that intervenor had expended the sum of $10,618.00 in weekly compensation benefits and $9,142.88 for medical expenses for plaintiff for a total of $20,030.88. The trial judge rendered judgment in its favor and against all other parties in that amount, but did not grant judgment for future payments. Intervenor has answered the appeal of defendant's and seeks an additional sum paid since that time together with any further sums it may be required to pay under its policy.
We, of course, cannot consider facts not placed in evidence in the court below and so we cannot award judgment for the specific sum paid out since trial. However, the law is clear that intervenor is entitled to reimbursement from the tort-feasors for all sums required to be paid out as workmen's compensation benefits. LSA-R.S. 23:1103; De Roode v. Jahncke Service, 52 So.2d 736 (La.App. Orl., 1951). Therefore, rather than remand this portion of the case solely for this purpose of showing the additional amounts, and there being no serious objection by the various counsel, *150 we believe it equitable to amend the judgment rendered in favor of intervenor, as follows:
"It is further ordered, adjudged and decreed that there be judgment herein in favor of The Insurance Company of North America, intervenor herein, and against the plaintiff, Joseph P. Barrois, and defendants herein, The American Insurance Company, Service Drayage Company, Inc., doing business as Ryan Crane Service, and Phoenix Insurance Company, jointly, severally and in solido, in the sum of $20,030.88, with legal interest thereon from May 17, 1967, until paid, and costs of intervention, together with such additional amounts it may be required to pay as workmen's compensation benefits until judgment becomes final herein, the same to be paid out of the judgment in favor of Joseph P. Barrois with first preference and priority."
The judgment of the trial court is affirmed in all other respects.
Amended and affirmed.
NOTES
[1] "Thus, if injury to the plaintiff arose out of the loading and unloading thereof, then the Service Drayage Company, would be an insured under the policy issued by the American Insurance Company, and American Insurance Company could respond in damage for any negligent action of Service Drayage Company or its employees, as a primary insurer, and the insurance company of the Service Drayage Company would be excess."
[2] "REQUESTED CHARGE NO. 4A Where a person exposes himself to a known danger he assumes the risk and is guilty of contributory negligence if injured."
[3] "REQUESTED CHARGE NO. 4B If an employee undertakes the performance of work, the danger of which he fully understands, the fact that he undertakes it unwillingly and for fear of losing his employment or of incurring the displeasure of his employer will not relieve him of the assumption of risk incident thereto."