304 So.2d 370 (1974)
Albun A. REEVES
v.
LOUISIANA AND ARKANSAS RAILWAY CO. et al.
No. 8777.
Court of Appeal of Louisiana, First Circuit.
April 22, 1974.
Rehearing Denied May 28, 1974.
Writ Refused July 1, 1974.
*371 John S. White, Jr., and Robert F. Kennon, Jr., Baton Rouge, for plaintiff-appellant.
Joseph E. LeBlanc, Jr., New Orleans, and Calvin E. Hardin, Jr., Baton Rouge, for Humble, and others.
Guy C. Lyman, Jr., New Orleans, for defendant L. & A. Railway.
Maurice J. Wilson, Baton Rouge, for defendant Fireman's Fund.
Before LANDRY, ELLIS and PICKETT, JJ.,
*372 LANDRY, Judge.
This tort action by plaintiff (Appellant) is presently before us on remand from the Supreme Court of Louisiana, for the sole purpose of assessing quantum for serious personal injuries sustained by Appellant in an accident which occurred on the premises of Humble Oil and Refining Company (Humble), Baton Rouge, Louisiana. The incident happened on July 16, 1968, when a flatbed truck in which plaintiff was seated was struck by a string of rail cars being backed on the tracks of Louisiana and Arkansas Railway Company (Railway) within Humble's plant. The trial court rejected plaintiff's claims upon finding plaintiff guilty of contributory negligence in remaining seated in a vehicle parked on Railway's tracks. This Court affirmed, see Reeves v. Louisiana and Arkansas Railway Company, et al., La.App., 263 So.2d 447. The Supreme Court granted certiorari reversed on the question of liability, and held Humble and Railway liable in solido. Reeves v. Louisiana and Arkansas Railway et al., La., 282 So.2d 503.
At the time of the accident, plaintiff was 57 years of age. Since October, 1967, plaintiff had been employed by a firm known as Plant Service Construction Company, in the capacity of truck driver, and was so employed when injured. Prior to employment by Plant Service Construction Company, plaintiff had been a welder continuously since 1952.
Plaintiff was attempting to get out of his truck when the vehicle was struck by defendant's train. At the moment of impact, plaintiff had managed to get only his feet and legs out of the vehicle. With plaintiff in this position, the vehicle overturned on plaintiff and both plaintiff and the truck were dragged approximately 150 feet before the vehicle came to rest. Plaintiff sustained multiple contusions and abrasions about the entire body, an extensive deep laceration of the left foot, contusion of the left shoulder, contusion of the left leg, severe sprain of both knees, injury to the left hand and a herniated intervertebral disc at the L-4-5 interspace.
On the day of the accident, plaintiff was seen in the hospital by Dr. Daniel J. Fourrier, who examined plaintiff and diagnosed all of the above mentioned injuries save the herniated disc. The day following the accident, plaintiff developed symptoms of thrombophlebitis or blood clotting which Dr. Fourrier considered serious. Dr. Fourrier applied an ace bandage to plaintiff's injured left leg to relieve the danger of a blood clot. On July 19, plaintiff complained of back pain radiating down into the left thigh and left foot which caused Dr. Fourrier to suspect a ruptured disc. X-rays of plaintiff's shoulder, knees, left leg and left foot disclosed no fractures. When plaintiff's back pain persisted, Dr. Fourrier called in consultation Dr. Joseph M. Edelman, Neurosurgeon, who ultimately determined plaintiff had sustained herniation of the L-4-5 vertebrae. On July 26, plaintiff was discharged from the hospital still suffering with back and leg pains, swelling in the legs and some thrombophlebitis in the left leg. Following discharge, plaintiff was seen by Dr. Fourrier on several occasions, on each of which plaintiff complained of swelling of the legs and pain in the back, left shoulder and legs. Because of these persistent symptoms, plaintiff was again hospitalized on August 5, and placed in traction for a few days When traction failed to ease plaintiff's back and leg pain, a myelogram was taken by Dr. Edelman. The myelogram revealed a possible ruptured disc at the L-5 interspace on the left side. Surgery performed by Dr. Edelman on August 13, confirmed the doctor's suspicion of a herniated disc at the L-4-5 interspace, which condition was corrected surgically. On August 16, Dr. Fourrier performed a vena cava ligation to prevent the possibility of a pulmonary embolism, or the lodging of a blood clot in plaintiff's lungs from the thrombophlebitis. This surgical procedure necessitated an abdominal incision. It is conceded that during this entire period, plaintiff *373 suffered from continuous pain in the low back, left shoulder, legs, and occasional chest pains. In addition, plaintiff's legs remained swollen, particularly the left limb. Plaintiff also experienced swelling of the foreskin of the gentalia which condition was not painful, but which remained for several months. In addition, plaintiff suffered from night sweats which the medical evidence shows is to be expected in cases involving such injuries.
Plaintiff was discharged from the hospital on September 4, with instructions to bed rest and use support hose on his legs. On November 19, 1968, Dr. Fourrier found plaintiff still suffering from back pain, inability to bend or straighten his back, marked muscle spasm, pain in left calf, and swelling of the left ankle and foreskin. In December, 1968, plaintiff complained to Dr. Fourrier of pain and numbness in the left leg, and of having leg muscle cramps at night. During the first six months of 1969, plaintiff was seen by Dr. Fourrier on several occasions. Each time plaintiff complained of back pain, left shoulder pain, pain and weakness of the legs, and inability to bend his back. Also during this period, plaintiff walked in a bent over or semi-flexed position. Examinations by Dr. Fourrier during this period disclosed presence of muscle spasm while plaintiff was standing, but not when sitting or lying down. Plaintiff also developed a numbness of the left little finger and a diminution of reflex action of the left achilles tendon. Throughout 1969, Dr. Fourrier found that plaintiff's condition remained essentially the same despite exercises which Dr. Fourrier prescribed be taken four times daily for ten minute periods to relieve the condition of plaintiff's left shoulder and legs. During 1970, plaintiff was seen monthly by Dr. Fourrier, who noted little improvement in plaintiff's condition. Dr. Fourrier also saw plaintiff in January and July, 1971. In each instance, plaintiff exhibited spasm of the back muscles while standing, but not while sitting or lying down. Dr. Fourrier also found limitation of the left shoulder, and observed that plaintiff was still walking in a bent over or semi-flexed position. Dr. Fourrier opined that plaintiff's continued muscle spasm was intentional, and also that he, Dr. Fourrier, had never before seen muscle spasm last so long following disc surgery; neither had he seen anyone walk in such a bent over position following surgical correction of a herniated disc.
Dr. Fourrier considered plaintiff's failure to improve was due at least in part to plaintiff's failure to adhere to the schedule of rehabilitative exercises prescribed by Dr. Fourrier and a therapist to whom plaintiff was referred. Dr. Fourrier explained that he never seemed to get through to plaintiff how the exercises were to be performed. He further explained that when he requested plaintiff to demonstrate the exercises, plaintiff never executed the movements according to instructions despite Dr. Fourrier's repeated explanations. Dr. Fourrier conceded that plaintiff is presently disabled from performing the duties of a truck driver. He also testified that following plaintiff's disc surgery, plaintiff should have been able to resume employment after about six months.
Following the disc surgery, plaintiff was seen by Dr. Edelman on November 18, 1968, at which time plaintiff was found to be holding himself quite rigid with the knees partially flexed and back arched forward. Dr. Edelman found plaintiff had practically no motion in his back, and also noted plaintiff was quite apprehensive about his condition. Dr. Edelman further noted back muscle spasm while plaintiff was standing, which condition was relaxed when plaintiff was laid on an examination table; this condition was believed by Edelman to be voluntary. Dr. Edelman prescribed heat treatment and limbering up exercises and suggested that plaintiff return in a month. On December 18, 1968, Dr. Edelman found plaintiff about the same except that plaintiff then possessed considerably more strength in the lower extremities. Dr. Edelman explained to *374 plaintiff that exercise was essential, and that plaintiff's progress would depend on plaintiff's personal efforts at rehabilitation. On this occasion, Dr. Edelman informed plaintiff that plaintiff was apparently not making a sincere effort at rehabilitation. When plaintiff returned on January 13, 1969, Dr. Edelman found real muscle spasm, and also observed that plaintiff's condition had worsened. Dr. Edelman attributed this in part to the fact that plaintiff related having experienced a fall on January 11, 1969. On January 20, 1969, Dr. Edelman found plaintiff had improved considerably in that plaintiff could flex his back about 40 to 45 degrees, although some evidence of muscle spasm was noted. At this time, Dr. Edelman believed plaintiff had recovered from the worst of plaintiff's acute back problem, and recommended that plaintiff rest for about a week, then resume exercising and return for a check up in about a month. On February 18, 1969, Dr. Edelman found that plaintiff had reverted to his former poor condition. Only 5 to 10 degrees of back flexion was observed. Muscle spasm was again noted when plaintiff was standing which condition passed when plaintiff was placed in a supine position. On this occasion, Dr. Edelman gave plaintiff a pep talk emphasizing the need for a strenuous program of rehabilitative exercises and asked plaintiff to return in a month. On March 18, 1969, Dr. Edelman found plaintiff worse than before. Plaintiff complained of a stinging sensation in both legs and inability to bend his back. While standing, plaintiff flexed his back only 10-15 degrees, whereas, while lying down plaintiff flexed to about 75 degrees without muscle spasm. Dr. Edelman noted that plaintiff seemed totally preoccupied with his condition. Dr. Edelman felt plaintiff was not making an effort at rehabilitation, and advised plaintiff there was no point in plaintiff returning unless plaintiff was willing to exert himself to improve his condition. Plaintiff was last seen by Dr. Edelman on May 5, 1970, at which time plaintiff's condition was found to be unchanged. Dr. Edelman considered plaintiff totally uncooperative. Dr. Edelman frankly admitted that not all disc surgery patients can be rehabilitated. Nevertheless, he felt that plaintiff is totally disabled, but that this condition is due to plaintiff's total failure to put forth any effort on plaintiff's own behalf. Dr. Edelman also felt that plaintiff would have improved had plaintiff tried. In Dr. Edelman's opinion, pain did not prevent plaintiff from exercising because plaintiff was found to be free of pain and muscle spasm when plaintiff's back and legs were manipulated while plaintiff was lying down.
At the request of plaintiff's counsel, plaintiff was seen and examined by Dr. J. Willard Dowell, Orthopedist, on four occasions, namely, April 15, 1969, January 8, 1970, June 23, 1970, and October 15, 1970, said examinations lasting approximately four hours in all. On the first visit, Dr. Dowell found plaintiff complaining of low back pain and pain in the left shoulder. He noted that plaintiff walked slowly, stiffly and in a somewhat bent over position. While standing, plaintiff held himself so stiffly that Dr. Dowell had difficulty detecting muscle spasm, but felt that some spasm was present. Dr. Dowell noted marked limitation of back motion and considered plaintiff disabled, but felt that plaintiff should improve in time if plaintiff exercised actively.
On the remaining visits, Dr. Dowell considered plaintiff's condition essentially unchanged. Dr. Dowell considered plaintiff's limitation of shoulder motion and back problem to be permanent, and that plaintiff will henceforth walk in a bent over position. He did not believe that exercise will remedy plaintiff's condition. Dr. Dowell considered plaintiff to be totally and permanently disabled.
Plaintiff testified to the constant, intense back, leg and chest pains which he endured following his injury. He stated his left leg, calf and ankle swell and ache; that his back and left shoulder are a constant source of pain, and that limitation of his *375 left arm is greatly restricted because of the injury to his left shoulder. He attested his difficulty in dressing himself without assistance from his wife in putting on his socks, shoes, shirt and coat. He stated that he attempted to take the exercises prescribed by Drs. Fourrier and Edelman, but could not do deep bends or lie on his back because of the pain. He went to the therapist for about a month, but discontinued the visits because of the pain which attended his being placed on a machine and pulled back and forth. He also stated his left little finger is numb and draws to the side; that he is unable to ride in a car without pain or sit still long enough to attend church, and that he cannot straighten his back without intense pain. He further stated he cannot bend over to eat and for that reason, must eat off a tray instead of at the table. He also stated he wakes up almost nightly and can sleep only two to three hours at a time. In effect, he stated that, because of the constant pain in his back, legs and shoulders, he is unable to work at all.
When injured, plaintiff was a member of Teamster's Local Number 5, earning a wage of $3.80 hourly and working 8½ hours daily, five days per week. Had plaintiff continued as a truck driver, he would have been earning $4.80 hourly at the date of trial in January, 1971. Income tax (W-2) forms appearing of record indicate that during 1965, 1966 and 1967, while employed as a welder, plaintiff had earned income of $6,101.72, $7,001.81 and $7,551.48, respectively.
An injured party is entitled to damages for past and future pain and suffering, loss of past and future earnings, permanent disability and incurred related medical expense where such damages are supported by competent evidence. Barrois v. Service Drayage Company, La.App., 250 So.2d 135.
In the assessment of damages for personal injuries and loss of earnings, much discretion is vested in the courts. Gaspard v. LeMaire, 245 La. 239, 158 So. 2d 149.
Awards for loss of future earnings, being speculative in nature, are not to be based on strict mathematical formula. Nevertheless, mathematical projections of future earnings may be used as one of the guides employed by courts in computing an award for loss of future income. Barrois, above; York v. Sedotal, La.App., 281 So. 2d 170.
The most that courts can do in fixing awards for loss of future earnings is exercise its sound discretion and award such amounts as will, under the circumstances of each case, appear just to both litigants. Viator v. Gilbert, 253 La. 81, 216 So.2d 821; Stevens v. Liberty Mutual Insurance Company, La.App., 133 So.2d 1.
An injured party is obligated to submit to reasonable medical treatment recommended for his improvement in order to minimize his damages. Donovan v. New Orleans Railway and Light Co., 132 La. 239, 61 So. 216; Welch v. Ratts, La. App., 235 So.2d 422.
A plaintiff who unreasonably refuses recommended medical treatment is not entitled to recover for any aggravation of his initial condition resulting from his unreasonable failure to submit to medical treatment recommended by competent medical authority. Roy v. Robin, La.App., 173 So.2d 222, and authorities therein cited.
Plaintiff has attached to his brief in this court certain economic data not introduced upon trial. Defendants have countered by appending like information to their briefs, which documents were also not introduced upon trial. In the disposition of this matter, we disregard all such purported evidence and decide the issue of quantum solely upon the evidence adduced upon trial.
To establish loss of past and future earnings, plaintiff offered the testimony of *376 Dr. Roger L. Burford, PHD in economics and statistics. Dr. Burford is a professor of quantative methods and is presently Director of the College of Business Administration, Louisiana State University. Dr. Buford calculated the present value of plaintiff's future lifetime earnings to be $71,385.00 from January 1, 1971, to the end of plaintiff's estimated future working life at age 68.5, or a total of 8.3 years. Using the $4.80 hourly wage, plaintiff would have earned at time of trial, and assuming an annual 25 cents per hour increase in wages, Dr. Buford calculated plaintiff's prospective earnings based on 50 weeks employment each year, allowing two weeks unpaid vacation annually. The dollar income thus determined was then discounted 5% to arrive at the present value of the future income, which calculation produced a present value of $81,300.00, the amount plaintiff would need to make up for lost income, assuming plaintiff lived to age 68.5 years. Then, using certain life expectancy tables, Dr. Buford applied an additional discount factor based on the probability of plaintiff living each year to age 68.5. This latter computation produced a figure of $71,385.00, which determination did not include any adjustment for future inflation.
In making awards for damages in this instance, we consider that plaintiff is totally and permanently disabled; that he will forever walk in a bent over condition; that he will unquestionably continue to suffer pain in his back, shoulder and legs, and that he will henceforth never lead a normal life. We likewise consider that while plaintiff did not absolutely refuse to undertake recommended rehabilitative exercises which may have improved his condition, nevertheless, the record establishes some lack of cooperation on his part in this area. In this regard, we note plaintiff's testimony to the effect that he did attempt to take prescribed exercises, but could not do so because of the pain. On the other hand, we note the medical evidence to the effect that plaintiff did not fully cooperate with his doctors. The degree to which plaintiff might otherwise have improved is a matter of conjecture. But for plaintiff's failure in this regard, we would have materially increased the quantum hereinafter awarded.
With these considerations as our guide, we conclude that plaintiff is entitled to an award of $40,000.00 for past and future pain and suffering, and an award of $20,000.00 for bodily injuries, disfigurement and continued disabilities.
Plaintiff lost earnings for approximately 2½ years between the date of injury and trial. We find an award of $14,000.00 will amply compensate plaintiff for this loss.
As regards loss of future earnings, we find nothing in the record to support a finding that plaintiff would have remained employed past the normal retirement age of 65 years. Under the circumstances, our award for loss of future earnings is based on the assumption that plaintiff's gainful employment would not extend beyond age 65. Based on these factors, we find an award of $30,000.00 for loss of future earnings will do substantial justice between the parties.
It is stipulated that plaintiff incurred medical expense in the sum of $4,641.50, which plaintiff is entitled to recover.
The court requested counsel for all parties to research and brief the question of whether awards for loss of earnings were subject to income taxes both state and Federal. The brief filed by plaintiff indicates that many jurisdictions have held taxability or nontaxability of awards is a matter which concerns only the plaintiff and the governmental authorities. For this basic reason, numerous courts have declined to consider taxability or nontaxability as an element in fixing an award. See Pfister v. City of Cleveland, 96 Ohio App. 185, 113 N.E.2d 366; Combs v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co., 135 F.Supp. 750; Spencer v. Martin K. Eby Constr. Co., 186 Kan. 345, 350 P.2d 18.
*377 Conversely, Insurer cites authority for the rule that taxability of awards for lost earnings should be considered pursuant to the compensatory theory of damages which seeks to reimburse an injured party only for losses actually suffered. This view holds that the damaged party should not be granted an advantage by recovering damages in excess of losses. See 2 Harper and James, The Law of Torts, § 25.12 pp. 1326-1328 (1956); Nordstrom, Income Taxes and Personal Injury Awards, 19 Ohio State Law Journal 212 (1958); Domeracki v. Humble Oil and Refining Company, 443 F.2d 1245 (3rd Cir. 1971).
In our own jurisprudence, three cases have adopted "net earnings" as the measure of lost earnings, particularly lost past earnings. In each instance, however, the claimant was engaged in a business from which expenses were obviously deductible from gross income in order to determine taxable income or wages. In Frye v. Joe Gold Pipe and Supply Co., La.App., 50 So. 2d 38 (Second Circuit), net income was used in the case of an independent gravel hauler who operated his own truck. In Jones v. Rodgers, La.App., 179 So.2d 674, the Second Circuit again used net income as shown on income tax returns in the case of a plaintiff engaged as a water well driller. In Breaux v. Valin, La.App., 138 So.2d 405, the Third Circuit awarded a traveling salesman lost earnings based on average weekly earnings disclosed on his income tax return.
Adams v. Allstate Insurance Company, La.App., 212 So.2d 204 (Fourth Circuit), without discussion allowed recovery of $424.00 gross lost pay predicated upon a stipulated loss of 53 days work. In Menard v. Travelers Insurance Company, La. App., 240 So.2d 390 (Third Circuit), a boilermaker was allowed a loss of gross wages without deduction of social security taxes, income tax withholding and expense of driving to and from work. In so holding, Menard, above, relied solely upon Adams, above. The same result reached in Menard, above, was also reached in Duplechin v. Pittsburg Plate Glass Company, La.App., 265 So.2d 787, wherein the Fourth Circuit refused to adjust an award for lost earnings of a pipefitter by deducting therefrom withholding or FICA taxes.
In Guerra v. Young Construction company, La.App., 165 So.2d 882, a truck driver employed by a corporation sued for personal injuries and lost wages. On appeal the court held that the trial court did not err in refusing to instruct the jury not to add an amount to its award for wages on the assumption that income taxes would be due thereon.
This court indirectly considered this particular issue in Hawsey v. United States Fidelity and Guaranty Company, La.App., 211 So.2d 417. In Hawsey, above, we denied a request for reduction in an award for lost wages based on gross earnings where the record contained no proof of expenses that would have reduced gross earnings.
Those jurisdictions which refuse to consider the effect of income and other taxes in assessing awards for lost earnings, do so on two basic grounds, namely: (1) The uncertainty of future tax rates and the speculativeness of the manner in which a particular plaintiff may be affected thereby, and (2) a tort-feasor should not benefit from an advantage which may accrue to the injured party from a collateral source.
After further consideration of this matter, we reach the conclusion, for the two basic reasons above set forth, that taxability or nontaxability of awards for lost earnings, past or future, should not be considered in assessing damages for such losses. Consequently, we have disregarded possible tax liability or consequences in making the awards for lost earnings in this instance.
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Albun A. Reeves, against defendants, Louisiana & Arkansas Railway Company and Humble Oil and Refining Company, in solido, in the sum of One Hundred Eight Thousand Six Hundred Forty-One and *378 50/100 ($108,641.50) Dollars, together with legal interest thereon from date of judicial demand, until paid, and all costs of these proceedings.
Judgment rendered on quantum only.

REHEARING
PER CURIAM.
In its Application for Rehearing, Firemens Fund Insurance Company (compensation insurer of Plant Service Construction Company), notes our failure to dispose of said Insurer's claim in intervention for workmen's compensation benefits paid plaintiff Reeves.
The author of the original opinion accepts responsibility for this obvious oversight.
Intervener's claim was expressly recognized by the Supreme Court. See Reeves v. Louisiana & Arkansas Railway Company, et al., La., 282 So.2d 503. Our failure to adjudicate Intervener's claim was not intended to imply rejection thereof. Counsel for all parties have stipulated that this procedural error may be rectified without granting a rehearing herein.
It is, therefore, ordered and adjudged that the decree originally rendered herein be and the same is hereby amended to award judgment in favor of Intervenor, Firemens Fund Insurance Company against plaintiff, Albun A. Reeves, and against defendants, Louisiana & Arkansas Railway Company and Humble Oil and Refining Company, now Exxon Company, U.S.A., recognizing and declaring Intervenor's right to preferential payment, out of the award to plaintiff Reeves, of the total amount of compensation paid Reeves by Intervenor to the time this judgment becomes final, together with legal interest.
The Application for Rehearing by Intervenor, Firemens Fund Insurance Company, and the Application for Rehearing by plaintiff, Albun A. Reeves, are denied.