399 So.2d 1225 (1981)
James BUCKLEY et al., Plaintiffs-Appellants,
v.
EXXON CORPORATION et al., Defendants-Appellees.
No. 7480.
Court of Appeal of Louisiana, Third Circuit.
May 27, 1981.
*1226 Evans, Bradley & Wallace, C. Allen Bradley, Jr., DeRidder, for plaintiffs-appellants.
William J. Sommers, Jr., New Orleans, Hall, Lestage & Lestage, W. E. Hall, Jr., DeRidder, for defendants-appellees.
Before GUIDRY, FORET and CUTRER, JJ.
FORET, Judge.
James and Earline Buckley (Plaintiffs) brought this action ex delicto on behalf of their minor child[1], Joel Buckley, to recover damages for personal injuries he suffered in an accident involving a large tractor-trailer truck. Defendants are Gilbert L. Royer, the driver of the truck, and his employer, Exxon Corporation, the owner of the truck.
The action was tried by a jury which returned a unanimous verdict in favor of defendants. The trial court, pursuant to that verdict, rendered judgment dismissing plaintiff's claim with prejudice, and plaintiff appealed to this Court. We affirmed the judgment of the trial court in an unpublished opinion. Plaintiff then applied for and was granted a writ of review by the Honorable Louisiana Supreme Court. The Supreme Court, in James Buckley, et al v. Exxon Corporation, et al, 390 So.2d 512 (La.1980), reversed the judgment of this Court and remanded the case to us solely for a determination of the amount of damages to which plaintiff is entitled.

FACTS
See the opinion of the Supreme Court in Buckley v. Exxon Corporation, supra, for an account of the facts surrounding the accident in which Joel Buckley was injured. It is sufficient for our purposes to simply state that Joel was injured when the rear wheel or wheels of a trailer being pulled by a tractor (commonly known as an eighteen-wheeler) either passed directly over his legs or over a bicycle which was lying partially on top of his legs.
Joel was seven years old at the time of the accident and suffered multiple traumatic fractures of both legs. He was immediately taken by ambulance to the emergency room of the Beauregard Memorial Hospital where he was initially treated. He was then transferred and admitted to the Huey P. Long Memorial Hospital in Pineville, Louisiana, that same day.
X-rays and diagnostic procedures performed at the Huey P. Long Memorial Hospital revealed that Joel had suffered the following major injuries:
1. A closed mid-shaft fracture of the left femur;
2. A closed type 1 avulsion fracture of the left tibia spine;
3. A closed non-displaced fracture of the right tibia; and
4. A closed fracture of the first metatarsal of the right foot.
A Steinman pin[2] was then inserted through Joel's left leg so that traction could be applied to it and a cast was applied to both legs. Joel was given in-patient care for nineteen days until he was discharged from the hospital on April 21, 1977. However, prior to his discharge, Joel was placed under general anesthesia and a double hip spica cast[3] was applied.
Joel's condition was monitored by physicians at the Huey P. Long Memorial Hospital after his discharge. He was then re-admitted *1227 to that hospital on June 14, 1977 for removal of the spica cast and physical therapy. He was discharged some six days later. Joel has been seen for treatment and evaluation by a number of physicians since that time, and members of his family have participated in his recovery by learning and applying certain physical therapy treatments.

QUANTUM
A. SPECIAL DAMAGES.
The medical expenses incurred for the treatment of Joel's injuries were stipulated to by counsel at trial. They amounted to $74.00 for use of the emergency room at the Beauregard Memorial Hospital and $968.40 and $197.80 from the Department of Health & Human Resources, Office of Hospitals, for the Huey P. Long Memorial Hospital, all of which amounts to a total of $1,240.20.
We therefore award plaintiff the sum of $1,240.20 for medical expenses.
B. GENERAL DAMAGES.
An injured party is entitled to damages for past and future pain and suffering, loss of past and future earnings, permanent disability and incurred related medical expenses where such damages are supported by competent evidence. Reeves v. Louisiana and Arkansas Railway Company, 304 So.2d 370 (La.App. 1 Cir. 1974), writ denied, 305 So.2d 123 (La.1974); Barrois v. Service Drayage Company, 250 So.2d 135 (La.App. 4 Cir. 1971), writ denied, 259 La. 805, 253 So.2d 66 (1971); Brignac v. Pan American Petroleum Corporation, 224 So.2d 84 (La. App. 3 Cir. 1969).
Factors to be considered in assessing quantum for pain and suffering are the severity and duration thereof. Walker v. St. Paul Insurance Companies, 339 So.2d 441 (La.App. 1 Cir. 1976), on remand, 343 So.2d 251 (La.App. 1 Cir. 1977), writ denied, 345 So.2d 61 (La.1977).
The record indicates, and common sense verifies, the fact that the injuries suffered by Joel were extremely painful. The frequent administration of narcotics and other pain killers as revealed by Joel's medical records, together with the observations of the nurses who attended him, convince this Court that Joel suffered through a painful ordeal made all the worse by his tender age. There is evidence in the record which indicates that Joel was still experiencing some pain as a result of the injuries suffered in the accident over seventeen months from the date of its occurrence.
The record also shows that Joel was an active child before he was injured but was unable to move his legs in any manner for some three months after the accident due to the cast which had been applied. He is still unable to participate in normal athletic activities with other children his age as there is still some stiffness in his left leg. We find that all of these factors produced much mental and physical pain and suffering for Joel and that such were a direct result of the injuries sustained by him in the accident.
Plaintiff also seeks to recover general damages for loss of future earning capacity and permanent disability.
Dr. J. Lane Sauls, a family practitioner in DeRidder, Louisiana, testified that he examined Joel twice, once on April 2, 1977, immediately following the accident, and again on May 31, 1979, approximately two weeks before the trial of this matter. He stated that at the time of his second examination, he found that Joel had only limited motion in his left knee and a limited ability to rotate his left leg. It was his opinion that the injuries suffered by Joel in the accident could lead to the above mentioned disabilities and limitations.
Dr. Jerome W. Ambrister, an orthopedic surgeon practicing in Lake Charles, Louisiana, first examined Joel on August 16, 1977. He found no residual symptoms with respect to Joel's right lower extremity, but did find some residual trouble in the left lower extremity, particularly the left knee in that it was rigid. He also found that the left leg was longer than the right and that Joel's thighs and calves were different in size. He attributed these residual effects to the injuries suffered by Joel in the accident.
*1228 He next examined Joel on September 5, 1978, which was some seventeen months after the occurrence of the accident. He noted that Joel was still complaining of pain in his left hip and was still walking with a limp. His examination revealed that there was still some limitation of motion in Joel's left knee, though it was much less than had been observed in the first examination. Dr. Ambrister testified that, at this time, he suspected that Joel was also suffering from a rotary malunion[4] of the left femur which could cause a person's foot to either point inward or outward, depending on which way the fractured bone had rotated and then healed. He also felt that Joel's residual condition would improve with the passage of time.
Dr. Ambrister last examined Joel on May 7, 1979, a little over a month before trial. He testified that Joel had regained even more motion in his left knee at this time. His examination revealed that Joel's left leg was still longer than the right and that there were still differences in the size of the knees and calves. Dr. Ambrister's best medical opinion was that there was a possibility that Joel would permanently suffer from some stiffness of the left knee. He again diagnosed a rotary malunion of the left femur but felt that there was no indication that this disability was severe enough to warrant corrective surgery. Dr. Ambrister also expressed the opinion that Joel would continue to improve with the passage of time. However, he did state that the different lengths of Joel's legs, together with the presence of the rotary malunion of the left femur and fracture of the left tibial epiphysis could lead to growth deformity in the future. We note, though, that there was expert medical testimony to the effect that the best method for detecting a rotary malunion was by special x-rays which were not employed by Dr. Ambrister in making his diagnosis of the presence of this condition.
Dr. James R. Oates, a specialist in physical medicine and rehabilitation practicing in Houston, Texas, first examined Joel on December 12, 1977. He too found that there was very limited motion in Joel's left knee and stated that this was consistent with the fact that the joint had been immobilized for such a long period of time.
He next examined Joel on May 8, 1979, at which time he found great improvement in Joel's ability to move his left knee. He stated that Joel's gait was perfectly normal. He could find no evidence of a rotary malunion of the fracture of the left femur but did state that he had made no x-rays.
Dr. Oates felt that Joel would have a slight (six percent) permanent residual disability in his left knee which would hamper his ability to perform in athletic competition. He also recommended, as did the other medical experts, that by placing a one-eighth to one-quarter inch lift in the heal of Joel's right shoe further problems with respect to the different lengths of Joel's legs could be avoided.
We find that plaintiff has proven that Joel will have a slight permanent disability of his left knee as a result of injuries suffered in the accident.
As to plaintiff's claim for loss of future earning capacity, we find that the record contains no evidence as to how, when, or how much the injuries sustained herein will affect the future earning capacity of this seven-year-old boy. We therefore find no merit in plaintiff's demands for damages for loss of future earning capacity.
For the above and foregoing reasons, judgment is rendered in favor of plaintiff and against defendants in the following amounts:
1. $1,240.20 for medical expenses;
2. $40,000.00 for mental and physical pain and suffering and disability, past, present and future.
It is therefore ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Earline Buckley, individually, in the amount of $1,240.20, plus legal *1229 interest thereon from the date of judicial demand; and
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Earline Buckley, as natural tutrix and in behalf of the minor child, Joel Buckley, in the amount of FORTY THOUSAND AND NO/100 ($40,000.00) DOLLARS, plus legal interest thereon from the date of judicial demand.
All costs of proceedings at trial and appellate level are assessed against defendants-appellees.
RENDERED.
NOTES
[1] At trial the defendants raised the peremptory exception of no right of action of James Buckley in the lawsuit because Joel Buckley was born fourteen months before the dissolution of an earlier marriage between his mother, Earline Buckley and Purvis Lewis. This exception was sustained at trial, leaving Joel Buckley's mother, Earline Buckley, as the remaining plaintiff.
[2] A Steinman pin is actually placed through the flesh and the bone of an injured extremity. The device which will place that extremity in traction is then attached to this pin. Joel was initially placed in what is termed Split Russell Skeletal traction.
[3] A double hip spica cast consists of a stockinette (bandage-type material easily applied) which is placed over the trunk and both lower extremities. Cast padding is then placed over the stockinette and cast material is applied and allowed to harden. The result is that both lower extremities are held rigidly in one position with respect to the trunk.
[4] A rotary malunion describes a medical problem in which parts of a bone which has been fractured rotate with respect to each other and then heal in this manner.