CURRAULT, Judge.
Defendants, Avondale Shipyards, Inc. and Liberty Mutual Insurance Company, have suspensively appealed judgments of the Twenty-Fourth Judicial District Court, Division “B”, wherein the Honorable Frank V. Zacearía cast defendants liable jointly and in solido for the full sum of $274,500.
The deceased, Preston Ealy, was employed by Aireo, Inc., as a truck driver, and on May 27, 1977, he was making a delivery of liquid oxygen to Airco’s customer, Avon-dale Shipyards, Inc., at Avondale’s Bayou Black Shipyard. After unloading the liquid oxygen into the storage tanks, Mr. Ealy was proceeding to disconnect the delivery hoses running irom the truck to the fill lines. While disconnecting the delivery hoses at the junction with the fill lines, an undetermined amount of liquid oxygen spilled. The spillage ignited, engulfing Mr. Ealy, and causing third degree burns to approximately 75 percent of his body. He was taken to Baton Rouge General Hospital where he died the following day.
Suits were brought on behalf of the illegitimate minor children of the deceased, Preston Ealy. Named as defendants were the deceased’s employer, Aireo, Inc., Avon-dale Shipyards, Inc., and Liberty Mutual Insurance Company. Aireo, Inc. was dismissed from these proceedings because of the exclusiveness of liability provision of the Louisiana Workmen’s Compensation Act. Because of a contract between Aireo, Inc. and Avondale Shipyards, Inc., Airco’s insurer, Liberty Mutual, in effect became the insurer of Avondale for any liability arising out of this accident.
The trial court concluded that the explosion and fire were ignited by a spark emanating from a fracturing water pipe as the result of the spillage of liquid oxygen onto the water pipe. The court further concluded that the placing of the water pipe, or the allowing of the water pipe to remain underneath the liquid oxygen pipes was a danger and should have been obvious to anyone with any knowledge or experience in the delivery of liquid oxygen. The trial court then held Avondale Shipyards, Inc. liable for allowing such a dangerous situation to exist. The trial court rendered judgment in favor of Betty Gail Price, individually and as tutrix of the minor, Tikisha Price, in the amount of $135,000, and in favor of Laura Mae Price, individually and as tutrix of the minor Courtney Tremon Price, in the amount of $139,000. The defendants cast in judgment were Avondale Shipyards, Inc. and Liberty Mutual Insurance Company. From that judgment, these defendants have suspensively appealed.
FACTS
Airco’s liquid oxygen storage facility at Avondale’s Bayou Black shipyard was erected in 1966. Aireo and Avondale contractually agreed that Aireo was solely responsible from the inspection and maintenance of this facility. However, there was no prohibition against Avondale personnel entering the site. In fact, some of Avondale’s employees were required to periodically enter the site to read the various gauges. This reading would determine when Avondale would call Aireo for delivery.
When delivery was made, a driver would back his truck up to the site. Then the driver would connect the delivery hose from the truck to the intake fill line. Once the storage tanks were filled, the driver would shut off both the delivery valve from the truck and the intake valve from the storage tank. A bleeder line valve would then be opened to allow any excess liquid oxygen to be released. The lines would be disconnect *510 ed and removed and delivery would be completed.
Aireo had unobstructed access to their facility at Bayou Black from 1966 until 1968, when Avondale laid three pipelines across the site. These pipelines ran within ten to fifteen feet of Airco’s intake line and storage tanks and carried water, argon and natural gas. Avondale subsequently enclosed the facility including portions of its own pipelines by erecting a chain-link fence. Avondale conducted these actions without consulting Aireo or seeking their permission.
With Avondale’s pipelines and fence obstructing their entry, Aireo drivers found it necessary to use two hoses connected together in order to reach the storage tank intake line. To remedy this, Aireo extended the intake line out ten to fifteen feet from the storage tank. As a result of the extension, the intake line was situated approximately six inches away from Avon-dale’s pipelines. Because of the length of the extended intake line and filling hose and the distance to the storage tank, it was not possible for the delivery driver to completely empty the connecting hose and intake line. Thus, there would always be some spillage of liquid oxygen even if the bleeder line were employed.
On the day of the accident, Preston Ealy stopped at the residence of Betty Price for a brief rest and shower. Collins Price, the brother of Betty Price, left with Preston Ealy to make the delivery to Avondale’s Bayou Black facility. They arrived at approximately 8:00 p.m. and secured passes to enter the facility. Mr. Ealy then backed his truck up to the Aireo storage tanks, connected the hoses and began the process of transferring the liquid oxygen from the truck to the storage tanks. The transfer was approximately an hour and forty-five minutes.
Mr. Ealy approached the rear of the truck and began the disconnecting process. Mr. Price remained in the truck and testified he heard a hissing sound lasting approximately ten (10) minutes. He then joined Ealy at the rear of the truck and watched as Ealy disconnected the hose from the truck. Ealy then attempted to disconnect the hose from the intake line by hand but was unsuccessful. He then secured his brass hammer and tapped the connection. An explosion of sorts ensued and Ealy was set ablaze.
Collins Price made several attempts to extinguish the flames, but was unsuccessful. A fire extinguisher was brought to the scene and the fire was put out.
Ealy remained at Avondale approximately thirty (30) minutes before medical assistance arrived. During this time, Ealy mumbled to Price but he was unable to understand him. Price accompanied Ealy in the ambulance as he was brought to Baton Rouge General Hospital where he died the following day.
SPECIFICATION OF ERRORS
By appellants:
that (I) The trial court erred in holding that Avondale Shipyards, Inc. was negligent; that
(II) The trial court erred in failing to find the plaintiff either solely at fault or at least guilty of contributory negligence; and that
(III) The award of damages by the trial court, particularly with respect to child support, was excessive based on the earnings of the deceased.
By appellee, Betty Price, tutrix of the minor, Tikisha Price:
that (I) The trial court erred in awarding only $135,000 in damages to a child, four years of age, at the time of her father’s death.
APPELLANTS’ ARGUMENT
I. LIABILITY OF AVONDALE
Appellants assert the trial court erred in holding Avondale negligent.
In a negligence case against the owner of a thing actively involved in the causation of the injury, the claimant must prove (A) that something about the thing created an unreasonable risk of injury that resulted in the damage; that (B) the owner *511 knew or should have known of that risk; and that (C) the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. The knowledge, whether actual or constructive, gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk. No responsibility is placed on the owner who acted reasonably, but nevertheless failed to discover that the thing presented an unreasonable risk of harm. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982).
A. The Water Pipe Created an Unreasonable Risk of Injury that Resulted in the Damage.
The trial court concluded that allowing the water pipe to remain in such close proximity to the liquid oxygen intake line created a dangerous situation. This conclusion is supported by the record.
Testimony was heard from two expert metallurgists. One, Dr. John H. Tabony, Jr., was retained by Avondale directly; the other, Dr. Courtney G. Busch, was engaged by appellee.
Appellee’s expert characterized the placing of the intake line so close to the water and other pipes as “exceedingly dangerous.” Avondale’s metallurgical engineer testified that “as an engineer, you probably would not put the water lines at that location.” Dr. Tabony felt that the greater the distance from the coupling of the intake line to the water pipe, the better. He testified that ten feet (unlike the five to seven inches between the intake line coupling and the water pipe) would be adequate protection.
Preston Ealy died as a result of burns he received when liquid oxygen he was handling ignited; however, the source of that ignition was sharply contested. The trial court concluded it was the cracking of the water pipe when the liquid oxygen fell upon it causing a spark to emanate and cause instantaneous flaming.
The trial court faced two theories explaining the ignition. One was the spark caused by the cracking of the water pipe. The other was that the deceased had upon his person some combustible substance or that he failed to clear the immediate area of all such combustible materials.
The record contains twenty-six (26) photographic exhibits. In no less than twelve (12) of these photographs, the crack in the water pipe is clearly visible. Three photographs visibly demonstrate that the distance from the intake line coupling down to the crack on the pipe below is only some five (5) to seven (7) inches. Dr. Busch’s report was introduced by stipulation and it was his professional conclusion that the liquid oxygen was ignited because of the presence of an ignition source (i.e., most probably, a spark from the broken water pipe). Avondale’s metallurgist’s testimony did not, when taken as a whole, contradict Dr. Busch; in fact, his testimony was consistent with and corroborative of Dr. Busch’s opinion.
Dr. Tabony testified he found the broken water line close to the hose coupling and that for this type fracture to occur, liquid oxygen would have had to come out of the line going to the tank. Dr. Tabony concluded that in his opinion the breaking of the metal water line could generate a spark. He testified further that it was “possible” that the accident was caused by the liquid oxygen dropping on the water pipe. Though Dr. Tabony insisted at first that the most probable source of ignition was contact with a combustible substance (e.g., oil, asphalt), and not the fracture of the pipe, upon further questioning, he summized that the liquid oxygen would ignite either from the carbonaceous material or from the water pipe. In addition, he did not find any evidence of such combustible material. In fact, he testified he did not conduct a cursory inspection of the premises in order to substantiate the possibility of identifying any material that might have served as the source of the ignition.
The trial court, faced with two possible sources of ignition, found sufficient evidence to conclude that the spark emanated from the fracturing water pipe. We are of the opinion that the trial court was correct *512 in finding that the spark emanated from the fracturing of the water pipe and served as the source of ignition.
B. Avondale Knew of the Dangerous Situation
Avondale placed the water pipe in its location in 1968. Not until 1976 did this pipe’s position take on significance because of the extension of the liquid oxygen intake line to within six inches of it. When that occurred, no less than three employees of Avondale with responsible positions knew of the new proximity of the liquid oxygen intake line to the water pipe. Avondale’s purchasing agent observed the relationship of the line and pipe within two weeks after the construction. In addition, both Avon-dale’s safety inspector, Tony Maranda, and Avondale’s gauge reader, Gilbert Arcen-eaux, had observed the new physical set up. It is undoubtedly evident Avondale knew of the dangerous situation.
C. Avondale Failed to Render the Thing Safe
The fatal accident occurred in May, 1977, almost a year after the hazardous situation was created. There is no evidence that Avondale took any steps to prevent the damage caused by the water pipe. The fact that the accident occurred is evidence enough to demonstrate Avondale failed to render the water pipe safe.
Appellants additionally argue that they are relieved of any liability because Aireo had exclusive control and custody over the area in which the accident occurred. Appellants further point out that they had contractually relinquished all responsibility to Aireo. We are of the opinion, however, that there was joint custody in that both parties exercised control over the area. Neither party demonstrated exclusive custody or control.
Avondale’s vice-president and manager of the Bayou Black facility where the incident happened was explicit that the fenced area was the sole responsibility of Aireo. However, this contention is contradicted by testimony of the appellant’s other witnesses.
Avondale’s purchasing agent, Lee Shelton, testified that Avondale, not Aireo, owned and maintained the water pipes exclusively even though a portion was within the fenced area. He further testified that Avondale personnel would routinely enter the area to take gauge readings.
Mr. Meade Willis, a former Aireo employee who was called as Avondale’s witness, also contradicted the vice-president of Avondale concerning responsibility within the fenced in area. He testified that upon approaching the pad, if combustible materials were showing in the area or on the pad, it would be the duty of the driver to inform the people receiving delivery, to either clean the area or straighten it out.
The trial court held Avondale liable as owner of the fractured water pipe. Avon-dale stipulated to its ownership, and we believe this is a sound ruling. Even if we were to find Aireo had exclusive control or custody of the area, that does not alter the fact that Avondale owned the fractured water pipe and allowed that pipe to remain in a place where it created an unreasonable risk of injury.
II. LIABILITY OF PRESTON EALY
Appellants contend the trial court erred in failing to find Preston Ealy either solely at fault or at least guilty of contributory negligence. Appellants, however, do not relate any facts to support their contention that the trial court erred in finding Ealy free of any negligence. Instead, appellants argue that Ealy failed to follow prescribed safety procedures and that because Ealy was the one who spilled the liquid oxygen, his negligence contributed to the accident. This argument is wholly unsupported by the record.
Appellants’ witness, Mr. Willis, had trained Mr. Ealy and had worked alongside him. He described Mr. Ealy as “one of the best” students and characterized him as a good worker. Later in the trial this witness testified that after he began working, Ealy gave due regard and attention to the safety procedures. There is not one iota of evi *513 dence that Mr. Ealy was negligent in his delivery of liquid oxygen.
The appellants rely upon two other facts to prove that Mr. Ealy failed to follow procedure and was, therefore, negligent: a bent gasket and a drain valve.
Appellants have contended that Mr. Ealy was using a defective gasket at the time. It is their contention that one can observe the distorted contour of the gasket from two of the photographs. By using this gasket, appellants contend, Ealy contributed to the leakage.
Again appellant’s own witness contradicts its theory of the case. In viewing photographic Exhibit D3, Mr. Willis stated that Mr. Ealy would have been unable to determine from sight whether the gasket was defective. Only after he started pumping the liquid oxygen would it become apparent he was using defective equipment. If the gasket was defective, the liquid oxygen would have been leaking at the beginning of the unloading. The combustion would have occurred almost ninety minutes earlier had Ealy negligently used a defective gasket.
All positive evidence pointed to the fact that the combustion did not take place until after the liquid oxygen had been discharged. Further, Dr. Tabony concluded that Ealy had completed the work he was doing and that the valve on the truck was shut off. Collins Price’s testimony was that they had been at the facility for approximately one hour and forty-five minutes, the time it takes to unload; and Mr. DeCuir, who arrived later in the morning, observed at that time that the trailer tank was empty-
Appellants next contend that had Ealy properly used the drain valve, the combustion would never have occurred. Several witnesses positively contradicted that allegation, and the appellants did not produce one witness to affirmatively state that the drain valve would or did prevent the residual leakage.
Three of the witnesses testifying had experience in the delivery of liquid oxygen: DeCuir, Willis and Brown. As to the Bayou Black site, they all testified that despite the presence and use of a drain valve there would still be some spillage from the mouth of the intake line. The spillage would occur because of the extension of the intake line and the distance between the shut-off valves and the storage tanks. Further, the only eyewitness to the accident, Collins Price, stated he heard a hissing sound like the releasing of pressure which indicates Ealy had employed the drain valve.
The burden was upon appellants to prove by a preponderance of the evidence that Ealy was contributorily negligent. Dofflemyer v. Gilley, 384 So.2d 435, 439 (La.1980). In the absence of evidentiary support in this case, appellants failed in their burden. Thus, we find no contributory negligence on the part of the deceased.
III. DAMAGES
Finally, appellants contend the trial court erred in awarding damages, particularly with respect to child support. The trial court awarded each child Twenty-Five Thousand Dollars ($25,000) for the loss of love and affection. Additionally, each child was awarded support in the full amount of Six Thousand Dollars ($6,000) per year, the trial court noting that this would be a reasonable amount to expect a father to spend on a child. Tikisha Price was only four years old at the time of her father’s death. She was awarded thirteen years of support, totalling Ninety-Eight Thousand Dollars ($98,000). Courtney Tremon Price, born on July 19, 1976, was awarded seventeen years of support, totalling One Hundred Two Thousand Dollars ($102,000). Appellants argue that with a salary of $15,760 earned in 1976 by Ealy, it is unreasonable to assume the deceased would have spent $12,-000 in child support.
Appellants seek to attack the trial court’s decision on the basis that $6,000 a year for each of two children would have exhausted decedent’s expendable income. The argument at first appears to have merit because Ealy had gross earnings the prior year of $15,760. However, had Ealy lived the re *514 mainder of 1977, he would have earned at the same job approximately $19,749. This figure is calculated on his earnings as of May 27, 1977, in the amount of $8,229.
The trial court’s $500 per month, or $6,000 per year estimate, was obviously an average over the years. Under the trial court’s judgment, Ealy would have been paying $500 a month in 1994, as well as 1977. The trial judge reasonably considered the increased financial burden of children as they grew older and merely used the $6,000 amount as a reasonable average sum. That Mr. Ealy would have contributed $6,000 per year in support of each of his children during their minority is not an unreasonable finding. The record does not clearly reveal that the judge abused his much discretion in finding that Ealy would contribute that amount to the support of his children.
Appellants additionally argue that the award was especially unreasonable when there was no evidence whatsoever of any monetary support by Ealy for the child, Courtney Tremon Price. However, this argument is contrary to the record.
Mrs. Odeal Lewis testified that Preston Ealy gave her the money to buy the clothes for Courtney so that he could come home from the hospital. Ms. Laura Mae Price, Courtney’s mother, testified, without even cross-examination, that Mr. Ealy had purchased medicine for her while she was pregnant. He directly purchased baby food and Pampers diapers and helped with other food. In addition, every other week he would give her $100.
The record is replete with testimony demonstrating that Ealy willingly and generously gave whatever was needed for the support of his ten month old son.
Before a court of appeal can disturb an award made by a trial court, the record must clearly show the trier of fact abused his much discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). We cannot find such an abuse with regard to the awards for child support and loss of love and affection.
APPELLEE’S ARGUMENT
I. DAMAGES
Appellee, Betty Price, contends that the award of $25,000 awarded to Ealy for pain and suffering was error by the trial court and such award should be $75,000. Ealy received severe burns over 75 percent of his body. After receiving these burns, Ealy lived approximately fifteen hours. Factors to be considered in assessing quantum for pain and suffering are the severity and duration thereof. Buckley v. Exxon Corp., 399 So.2d 1225 (La.App. 3d Cir.1981). After reviewing the facts, we cannot find that the trial court abused its discretion in the award because of the severity and duration of the deceased’s injury preceding his ultimate death. Following the mandate of Coco v. Winston, supra, therefore, we affirm the trial court’s award of damages.
For the reasons discussed above, the judgment of the district court is affirmed. Appellants are to pay costs of this appeal.
AFFIRMED.